# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-4378

_____

Barry Caesar Garcia,      *
     *
     *
     Petitioner-Appellant,      *
     *    Appeal from the United States
     v.      *    District Court for the District of
     *    North Dakota.
Leann K. Bertsch, Director of the      *
North Dakota Department of      *
Corrections      *
     *
     *
     Respondent-Appellee.      *

_____

Submitted: September 25, 2006
Filed: December 12, 2006 (Corrected on 12/14/06)

_____

Before ARNOLD, BYE, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Barry Caesar Garcia was convicted in North Dakota state court of murder and aggravated assault and was sentenced to life in prison without the possibility of parole with a concurrent five-year sentence. Garcia exhausted all of his state court remedies

and then filed this habeas petition in federal district court. The district court[1] denied his petition. Garcia is appealing three claims: violation of his Sixth Amendment public-trial right, ineffective assistance of counsel in failing to adequately address alleged juror misconduct, and ineffective assistance of counsel in failing to present mitigating information at sentencing. We now affirm.

I.      Background

        We adopt the following facts from the North Dakota Supreme Court's decision on direct review. State v. Garcia, ("Garcia I") 561 N.W.2d 599 (N.D. 1997).

        On the evening of November 15, 1995, a group of young men, including Barry Garcia, Jaime Guerrero, and Michael Charbonneau, drove around the Fargo-Moorhead area in a brown, 1975 Ford sedan owned by one of their mothers. In the car they had ten to fifteen red and green shotgun shells and a sawed-off shotgun owned by the Skyline Piru Bloods, a gang to which Guerrero and some of the other young men belonged. Around 10 p.m., while driving through a West Fargo residential neighborhood, Garcia asked the driver to stop. Garcia and Charbonneau, who was much taller than Garcia, got out of the car. Garcia took the gun with him. The car continued down the street and came to a stop. Garcia and Charbonneau began walking around the neighborhood.

        At the same time, Pat and Cherryl Tendeland were dropping off their friend, Connie Guler, who lived in the West Fargo neighborhood. After Pat pulled into Guler's driveway, Guler noticed two young men walking toward them. Guler thought that the shorter of the two was carrying a gun. Pat disagreed, thinking it was an umbrella. After standing near Guler's driveway for awhile, the two young men turned

---

[1]The Honorable Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.

around and walked back toward the brown Ford. Finding their behavior suspicious, Pat decided to back out of the driveway and follow the boys "'to see where they [were] going.'" Guler remained in the car with Pat and Cherryl.

As the Tendeland car approached the brown Ford, Charbonneau walked briskly toward the Ford while Garcia lagged behind. The Ford began to pull away. Guler testified at trial that at that moment something caught her eye, she turned, and she saw the shorter boy standing right outside the Tendeland car. She saw him raise the gun and shoot. Cherryl was shot in the forehead and shotgun pellets struck Pat's face. Cherryl was pronounced dead at the emergency room.

Garcia's trial prompted much publicity in the area, and the trial court had granted expanded media coverage. At the trial, the state called Jaime Guerrero as a witness. When asked his name, Guerrero responded, "I am not going to say nothing." The court called a recess. Away from the jury, Guerrero asked to speak with a lawyer, and the court appointed a lawyer who was already representing Guerrero in juvenile court. While Guerrero was still conferring with his lawyer, the State's attorney requested to clear the courtroom of media and anyone other than the families of Garcia and the victim. The State's attorney cited concerns over the television coverage and the large number of spectators. The State's attorney urged the court to "present a more friendly environment . . . for the testimony of this child, who is only fifteen years of age." Garcia's lawyer objected, arguing that there was "no compelling reason to shut things down at this point."

The court then held a conference in chambers with Garcia and his lawyer, Guerrero's lawyer, and the State's attorney. Guerrero himself was not present. The State's attorney explained that he had just promised to dismiss with prejudice the juvenile charges against Guerrero in exchange for Guerrero's truthful testimony in Garcia's trial. Guerrero's attorney stated that Guerrero was reluctant to testify in front of all the cameras and that he was "intimidated by the whole spectacle of the trial."

After Garcia's lawyer objected again, the State's attorney alluded to the fact that another potential witness who had been subpoenaed "has indicated a reluctance to provide testimony . . . because of actual repercussions that he's already experienced." The State's attorney stated, however, that he had no personal knowledge of those events.

The court declined to rule on the motion until it had heard arguments from a media representative. Once the media had an opportunity to be heard, the court ruled:

> It is the opinion of the Court that in this particular case that it is in the interest of justice to suspend the expanded media coverage order for this witness, and to suspend the rule as regards to media coverage.
>
> Exercising the inherent powers of the Court to control the courtroom, I am going to order that the courtroom be cleared, that the feeds to the radio and the television be terminated, and that all persons [leave the courtroom], except for counsel, Mr. Garcia, and Detective Warren, and the immediate family of . . . Mr. Garcia, and the immediate family of Mrs. Tendeland.
>
> When I say "the immediate family" of Mrs. Tendeland, I mean Pat Tendeland and the two sons. And that's it. And when I say the immediate family of Mr. Garcia, I mean Mr. Garcia's grandmother and Mr. Garcia's brother is present. And I think that's it.
>
> The cautionary instruction I intend to give . . . will read as follows: Ladies and gentlemen of the jury, as you are aware, Mr. Guerrero has indicated an unwillingness to testify. He has expressed a concern about all the media coverage, all of the people–and all the people in the courtroom.
>
> Taking into consideration the youth of Mr. Guerrero and his concerns, the Court has determined that in order to facilitate his testimony, the courtroom will be cleared of all persons. You are not to draw any conclusions or inferences from the clearance of the courtroom.

The court then gave the cautionary instruction, and in front of only immediate family members of Garcia and the victim and one representative chosen by the media, Guerrero testified that Garcia was the shooter. According to Guerrero, Garcia was still carrying the gun when he and Charbonneau returned to the car, and Garcia said "they got her," and "next time, don't look at me." After Guerrero's testimony, the court reopened the courtroom to the public and media.

Garcia appealed his conviction, arguing, among other things, that his Sixth Amendment right to a public trial was violated when the trial court partially closed the courtroom during the testimony of Jaime Guerrero. The North Dakota Supreme Court affirmed Garcia's conviction on April 1, 1997. Garcia I, 561 N.W.2d at 612. Garcia's petition for writ of certiorari was denied by the United States Supreme Court on October 6, 1997. Garcia v. North Dakota, 522 U.S. 874 (1997).

Garcia then filed a petition for post-conviction relief in state trial court. In his petition, Garcia argued that he was entitled to relief because of several instances of ineffective assistance of counsel, including a failure to adequately respond to alleged juror misconduct and a failure to present mitigating evidence during sentencing.[2] The trial court denied relief, and Garcia appealed to the North Dakota Supreme Court. While on appeal, Garcia filed a second petition for post-conviction relief in state trial court. The North Dakota Supreme Court temporarily remanded his first application to allow the trial court time to act on Garcia's second petition. After the trial court dismissed Garcia's second petition, the North Dakota Supreme Court took up both petitions and affirmed the trial court's denials of the petitions. Garcia v. State, ("Garcia II") 678 N.W.2d 568, 578 (N.D. 2004).

---

[2] We address the facts material to the ineffective assistance of counsel claims below.

Garcia then filed this petition for a writ of habeas corpus in the United States District Court for the Southern District of Illinois, which was later transferred to the District of North Dakota. The district court denied all of Garcia's claims, but granted a certificate of appealability for the following claims: violation of Sixth Amendment public-trial rights, ineffective assistance of counsel in failing to adequately address alleged juror misconduct, and ineffective assistance of counsel in failing to present mitigating information during sentencing. We review these claims in turn.

II.     Standard of Review

When reviewing the district court's denial of a habeas petition, "'[w]e review the district court's findings of fact for clear error and its conclusions of law de novo.'" Lyons v. Luebbers, 403 F.3d 585, 592 (8th Cir. 2005) (quoting Hall v. Luebbers, 341 F.3d 706, 712 (8th Cir. 2003) (alteration in original)). If an issue has been adjudicated on the merits in state court, we will only grant habeas relief if the state court proceeding "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (quoting Williams v. Taylor, 528 U.S. 362, 405-06 (2000)). "'[I]t is not enough for us to conclude that, in our independent judgment, we would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable.'" Middleton v. Roper, 455 F.3d 838, 845 (8th Cir. 2006) (quoting Rousan v. Roper, 436 F.3d 951, 956 (8th Cir. 2006)).

III.    Sixth Amendment Right to a Public Trial

Garcia first argues that the trial court violated his Sixth Amendment right to an open trial when it partially closed the courtroom during the testimony of Jaime Guerrero.  The North Dakota Supreme Court's resolution of this issue was not objectively unreasonable, therefore, we affirm.

The Sixth Amendment protects the accused's right to a public trial.  See Waller v. Georgia, 467 U.S. 39, 44-47 (1984).  This right helps to ensure "that judge and prosecutor carry out their duties responsibly" and "encourages witnesses to come forward and discourages perjury."  Id. at 46.  The right to an open trial, however, "may give way in certain cases to other rights or interests."  Id. at 45.  "Such circumstances will be rare, however, and the balance of interests must be struck with special care."  Id.  According to the Court:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.  The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

Id. (quoting Press-Enterprise Co. v. Superior Ct. of Cal., 464 U.S. 501, 510 (1984)).

Many courts, including this one, have distinguished the complete closure in Waller from partial closures.  In cases where a trial judge orders a partial closure at the request of one party, courts have required only a "substantial reason" for the partial closure, instead of the more stringent "overriding interest" required by Waller.  See United States v. Osborne, 68 F.3d 94, 98-99 (5th Cir. 1995) (noting that the Second, Eighth, Ninth, Tenth, and Eleventh Circuits all apply the "substantial reason" test for partial closures).  This test is appropriate in partial closure cases "because a partial closure does not 'implicate the same secrecy and fairness concerns that a total

-7-

closure does.'" United States v. Farmer, 32 F.3d 369, 371 (8th Cir. 1994) (quoting Woods v. Kuhlmann, 977 F.2d 74, 76 (2nd Cir. 1992)).

Garcia argues that the reasons given by the trial court for the closure of the courtroom—his age and the need to facilitate testimony—were not "substantial." He claims that Guerrero himself never gave any reasons, even through his lawyer, for being reluctant to testify in public, and that the reasons courts have deemed substantial in other cases were not present in this case. He also contends that the trial court did not make findings adequate to support the closure, instead relying on "vague statements" made by the State's attorney and Guerrero's attorney.

We believe the North Dakota Supreme Court properly distinguished this case from Waller, and was correct in applying the Farmer rule. We do not necessarily agree, however, that the facts of this case satisfy the rule in Farmer. In Farmer, we upheld the partial closure of the courtroom during the testimony of a seventeen-year-old victim of sexual assault. See Farmer, 32 F.3d at 370. Citing the Tenth Circuit's decision in United States v. Galloway, 937 F.2d 542, 546 (10th Cir. 1991), we recognized that when determining whether a partial closure is supported by substantial reasons, the "appropriate factors to weigh include the age of an alleged victim, the nature of an alleged offense and the potential for harm to the victim." Farmer, 32 F.3d at 371. In Farmer, we found evidence in the record that the defendant "had threatened the [seventeen-year-old] victim [of sexual assault] and that she feared retaliation" by him and his family. Id. at 372. The facts in this case are different. Guerrero was only fifteen years old when he testified, which would seem to make partial closure more justifiable, but he was not the victim of a crime. Quite the contrary, he was present at the time of Cherryl Tendeland's murder and Garcia had named him as the gunman.

The partial closure of a courtroom while a non-victim is testifying is rare. In one case, Woods, 977 F.2d at 76-77, the court held that protecting the safety of a witness is an interest substantial enough to allow the partial closure of the courtroom.

In Woods, unlike this case, the prosecutor explained to the trial judge that the witness was "'scared to death' because she had been threatened by at least one member of the defendant's family." Id. at 76. The trial judge also had an "exchange" with the witness, where she told the judge herself that she was reluctant to testify because she feared for the safety of herself and her family. Id. at 77. In this case, however, Guerrero himself did not say why he was reluctant to testify. The trial court did not hold an evidentiary hearing to clarify the reasons for Guerrero's silence. As such, there is no evidence in the record of any specific threats against him personally, or against his family members. It is also not clear from the record whether the trial court properly weighed the alternatives to a closure. While Farmer does not require specific findings by the trial court in order to uphold the decision to grant a partial closure, the appellate court must be able to "glean sufficient support for a partial temporary closure from the record." Farmer, 32 F.3d at 371. We are not confident that sufficient facts can be found on this record.

Even though we may not have approved the partial closure had this case come to us on direct appeal of a federal trial, habeas relief is not available based on conflicting interpretations of circuit precedent. Williams v. Taylor, 529 U.S. 362, 381 (2000) ("[T]he lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); see also Carter v. Kemna, 255 F.3d 589, 592 (8th Cir. 2001) (stating that in the absence of controlling Supreme Court precedent, a lower federal court cannot reverse a state court decision even though it believes the state court's decision was "possibly incorrect") . For us to grant habeas relief in this case the state court's decision must be contrary to Supreme Court law, or "different than the Supreme Court's conclusion on a set of materially indistinguishable facts." Carter, 255 F.3d at 591. The Supreme Court has not spoken on the partial closure issue, and the Court's closest case, Waller, is distinguishable on its facts. Our belief that the issue may have been decided differently in our court or in another circuit court is not grounds for granting habeas relief.

In Garcia I, the North Dakota Supreme Court expressed concern about the lack of an evidentiary hearing and stated that it would have been better if Guerrero himself had explained his reluctance to testify. Garcia I, 561 N.W.2d at 606. Ultimately, however, the court determined that the trial court's stated reasons, Guerrero's age and the need to facilitate his testimony, were substantial enough to warrant a partial closure of the courtroom. Id. at 606-07. It also found that the trial court properly considered reasonable alternatives, and determined that a partial closure was the only adequate solution for the court. Id. Because the North Dakota Supreme Court's decision does not conflict with Supreme Court precedent and because the court's decision was not objectively unreasonable, we affirm the district court's denial of Garcia's habeas petition.

IV.    Ineffective Assistance of Counsel

Garcia also argues that ineffective assistance from his trial attorney violated his Sixth Amendment rights because his attorney failed to report alleged juror misconduct to the judge and because he did not present mitigating evidence at Garcia's sentencing hearing. Ineffective assistance of counsel claims are mixed questions of law and fact, reviewed de novo. Kenley v. Armontrout, 937 F.2d 1298, 1301 (8th Cir. 1991). In order to prevail on his ineffective assistance of counsel claims, Garcia must demonstrate that "(1) his trial counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney, and (2) there is a reasonable probability the outcome of the trial would have been different absent the substandard actions of trial counsel." Middleton, 455 F.3d at 846. "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'" Winfield v. Roper, 416 F.3d 1026, 1033 (8th Cir. 2006) (quoting Wiggins v. Smith, 539 U.S. 510, 534 (2003)).

A.    Failure to Report Juror Misconduct

In an affidavit submitted during the state court post-conviction proceeding, Garcia's family friend Jill Johnson-Danielson stated that she had observed one of the jurors socializing and smoking with non-jurors outside the entrance to the courthouse during breaks on two days of the trial.  She claimed she informed Garcia's trial counsel about what she had observed and, to her knowledge, he took no action.  The state submitted an affidavit from Garcia's trial counsel in which he stated that he did not recall the conversation with Johnson-Danielson, but that, if it occurred, he probably would have told her she should keep an eye on it and he would also.

During the state post-conviction evidentiary hearing the court allowed Garcia's counsel to make an offer of proof that Garcia's aunt, Ms. Alexander, was prepared to testify that she observed two or more members of the jury talking to members of the Tendeland family during a break.  She stated that she had informed Garcia's trial counsel and requested that he bring it to the court's attention and that he did not do so.  Garcia's trial counsel testified that he did not report the contact claimed by Johnson-Danielson but that he had talked to the bailiffs about it.  This statement was inconsistent with his earlier affidavit.  He also testified that he did not recall having any conversations with Alexander about juror misconduct.

Garcia argues that his trial attorney's performance was ineffective because he failed to report alleged juror misconduct.  The North Dakota Supreme Court properly identified Strickland v. Washington, 466 U.S. 668 (1984), as the controlling case, and decided Garcia's claim on prejudice grounds.  Garcia II, 678 N.W.2d at 574, 577; see also Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").  We will limit our discussion to the prejudice issue as well, and we affirm.

Garcia relies on Remmer vs. United States, 347 U.S. 227 (1954), to argue that prejudice must be presumed in this case.  The Court in Remmer held that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." Id. at 229.  In Remmer, a juror reported to the judge that "a person unnamed" had "remarked to him that he could profit by bringing in a verdict favorable" to the defendant.  Id. at 228.  The Court vacated the defendant's conviction and remanded the case for "a hearing to determine whether the incident complained of was harmful to the [defendant], and if after hearing it is found to have been harmful, to grant a new trial."  Id. 230.

The North Dakota Supreme Court correctly distinguished Remmer from the facts of this case because, unlike Remmer, Garcia presented no evidence that any conversations that took place involved "communication about a matter pending before the jury."   Additionally, we find no suggestion in the record that persons who allegedly took part in prohibited discussions were unavailable for interviews or to sign affidavits.  The North Dakota Supreme Court's decision that Remmer does not apply and that actual prejudice must be proved in this case is not objectively unreasonable.

Similarly, the North Dakota Supreme Court's determination that Garcia did not prove actual prejudice is not objectively unreasonable.  There is no evidence that the jurors were influenced in any way by their contact with non-jurors.  Garcia had an opportunity to put forth such evidence, and again, we find nothing in the record indicating that those participating in prohibited discussions were unavailable. Further, the state trial court's verdict was supported by ample evidence, including the testimony of Guler and Guerrero at trial.  We agree with the district court that without any proof, "any claim that the outcome of the trial would have been different amounts to nothing more than utter speculation."

B.      Failure to Present Mitigating Evidence During Sentencing

Garcia also contends that his attorney failed to present mitigating evidence during his sentencing hearing and that this constituted ineffective assistance. The North Dakota Supreme Court disposed of this issue on prejudice grounds as well. We affirm the district court's ruling that the court's decision was not objectively unreasonable.

At the sentencing hearing, Garcia's trial counsel made an impassioned argument as to why the court should consider a sentence less than life without parole. He spoke of Garcia's youth and the possibility that young people can change. He also stated that Garcia's family could testify as to his positive characteristics.

However, Garcia's counsel did not present any other mitigating evidence, nor did he include the mitigating circumstances relating to Garcia's traumatic and chaotic childhood in his argument. He did not have any members of Garcia's family or any of Garcia's neighbors testify at the sentencing hearing. The presentence investigation report contained no letters from Garcia's family and friends, although it did contain one paragraph discussing his troubled childhood. The paragraph stated that Garcia had "a history significant for extreme family chaos and instability." He was "exposed to criminal activity at a very early age," his mother was murdered when he was twelve-years-old, and his father was incarcerated "on a parole violation for an original conviction of murder." It also noted that prior to his arrest, Garcia had lived with his Grandmother and his three younger brothers. Garcia did not testify at the hearing.

The trial court evaluated the fourteen "guiding" sentencing factors set forth in N.D. Cent. Code § 12.1-32-04. The court determined that the factors favored the State's position of life imprisonment without the possibility of parole. As it had discretion to do, the court also looked at "other factors," and ultimately based its

-13-

sentence on the cold, senseless nature of the crime, Garcia's long and often violent criminal history, and Garcia's unwillingness to accept responsibility and acknowledge the wrongfulness of his actions.

At the state post-conviction evidentiary hearing, Garcia provided a number of affidavits from people stating that they would have testified that Garcia was a hard-working, kind boy who took care of his younger brothers and was trusted by his neighbors. The affidavits also describe his troubled childhood in more detail than the one paragraph included in the presentence investigation report. In his testimony during the post-conviction hearing, Garcia's trial counsel stated that he had not presented any mitigating evidence because he believed that it would not do any good given that Garcia was maintaining his innocence and not accepting responsibility for the offense.

To show he was prejudiced by his attorney's actions, Garcia must demonstrate a reasonable probability that he would have received a punishment other than life in prison without the possibility of parole had the sentencing court heard the testimony in question. Middleton, 455 F.3d at 847; see also Strickland, 466 U.S. at 699-700 (stating that prejudice does not exist if "there is no reasonable probability that the omitted evidence" would have resulted in a lesser sentence).

The North Dakota Supreme Court concluded that there was no reasonable probability that the sentence would have been less harsh if the additional mitigating evidence had been presented. Garcia II, 678 N.W.2d at 577. Garcia's argument that he was prejudiced relies in part on the trial court's statement that it "came into this case, looking for some reason, some justification, some excuse, to hand down a sentence less than the maximum. Mr. Garcia has given me no alternative, he has given me no opportunity." The court did appear frustrated. Looking at the complete statement, however, it appears that the real source of the court's frustration was

Garcia's refusal to accept responsibility and to "express a real willingness to make amends to the fullest extent possible." The court was looking for evidence showing that Garcia was in a position to change so that it could justify giving him a lower sentence.

Under North Dakota law, the court had guidelines to follow in imposing Garcia's sentence. However, the court was also given considerable discretion to look at other factors, such as Garcia's youth, before determining the ultimate sentence. The trial court stated at the outset of sentencing that in determining Garcia's sentence, it would use information in the presentence investigation report, documents in the court file, police reports, a report from the North Dakota State Hospital, and victim impact statements. The information about Garcia's troubled upbringing in these documents, although brief, gave the court the information it needed to properly assess the sentencing factors. While the testimony from his friends and family may have been impassioned and would have elaborated on his troubled childhood, it would not have been materially different from the information in the presentence investigation report. Further, given the other evidence, such as Garcia's violent past and his unwillingness to accept responsibility for the crime, any mitigating testimony likely would have been outweighed even if presented. We do not think the testimony from Garcia's friends and family would have resulted in a more lenient sentence than Garcia received. We agree with the district court that the North Dakota Supreme Court's resolution of this issue was not objectively unreasonable.

V. Conclusion

For the forgoing reasons, we affirm the district court's decision to deny Garcia's habeas petition.

ARNOLD, Circuit Judge, dissenting.

I would grant habeas relief in this case because I believe that the action of the trial court in closing Mr. Garcia's trial to the public ran contrary to the Supreme Court's holding in *Waller v. Georgia*, 467 U.S. 39 (1984). It is true, as the court notes, that the present case is not factually identical to *Waller*, but our case falls within its rule because it is sufficiently like it in every material respect. The rule of *Waller* requires the trial court to hold a hearing and make specific findings with respect to why certain identified interests allow the closing of a court room. Here, the trial court failed to do that: It took no testimony from anyone, much less the reluctant witness; and the allegations of counsel, even if credited, were much too vague to support a conclusion that interests sufficient to trump a right to the traditional public procedure were at risk. I would therefore hold that the trial court violated *Waller* and that Mr. Garcia is entitled to relief.

In denying Mr. Garcia's petition, I believe that the court reads *Waller* too narrowly and greatly circumscribes the right to a public trial that the Sixth Amendment rather explicitly confers on criminal defendants. I therefore respectfully dissent from the judgment.

_____