STATE of Minnesota, Respondent,

v.

Edison Joseph MAHKUK, Appellant,

and

Edison Joseph Mahkuk, petitioner,
Appellant,

v.

State of Minnesota, Respondent.

Nos. A05–1520, A06–2087.

Supreme Court of Minnesota.

Aug. 9, 2007.

John M. Stuart, State Public Defender, Steven P. Russett, Assistant State Public Defender, Office of the State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Thomas A. Weist, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

PAGE, Justice.

Appellant Edison Joseph Mahkuk appeals his conviction for aiding and abetting the November 26, 2004, shooting deaths of Del Anthony Benjamin and Joseph George Burns. A Hennepin County jury found Mahkuk guilty of one count of first-degree premeditated murder and one count of first-degree premeditated murder for the

benefit of a gang for both the death of Benjamin and the death of Burns. *See* Minn.Stat. §§ 609.185(a)(1); 609.229, subd. 2 (2006). The district court merged the two counts with respect to each victim, entered judgments of conviction for first-degree premeditated murder for the benefit of a gang for each victim, and sentenced Mahkuk to two consecutive terms of life in prison. Mahkuk appealed his conviction but subsequently had his direct appeal stayed pending the resolution of his petition for postconviction relief. The postconviction court denied the petition.

In this consolidated appeal, Mahkuk raises seven issues, six relating to his direct appeal and one relating to the denial of his petition for postconviction relief. With respect to his direct appeal, Mahkuk argues that: (1) the trial court's jury instruction regarding aiding and abetting first-degree murder was an abuse of discretion; (2) the trial court violated his constitutional rights when it excluded members of his family from the courtroom for part of the trial; (3) the trial court abused its discretion by admitting gang expert testimony; (4) the trial court abused its discretion in ruling that the state could elicit testimony regarding Mahkuk's previous arrest; (5) the trial court abused its discretion by declining to compel the state to accept Mahkuk's stipulation that he was a member of a criminal gang; and (6) the trial court abused its discretion in declining to declare a mistrial after a witness referenced inadmissible evidence. With respect to the denial of his petition for postconviction relief, Mahkuk asserts that the newly available testimony of his alleged accomplice entitles him to postconviction relief in the form of a new trial and that, in denying him that relief, the postconviction court abused its discretion. We conclude that the trial court abused its discretion in the instruction it gave the jury regarding aiding and abet-

ting first-degree murder and, on that basis, we hold that Mahkuk is entitled to a new trial.

The events leading to the shooting deaths of Benjamin and Burns began at around 6:30 or 7:00 p.m. on November 26, 2004, when Mahkuk, Vincent Williams, Mike McFarlane, and Marcel Rainey went to the Little Earth Housing Complex (Little Earth) in Minneapolis to drop off McFarlane's girlfriend. From that point until 4:00 the next morning, there is no evidence in the record regarding Mahkuk's whereabouts or activities.

At approximately 4:00 a.m., a group of individuals including Burns, Benjamin, Douglas Jackson Ellis, Anthony Jackson, and Brino Gamboa, who had been drinking at various places throughout the night, was walking through the courtyard area of the Little Earth complex. Burns and Benjamin stopped and began talking to Jena White. White, who had also been drinking, was standing on a balcony overlooking the courtyard. Shortly thereafter, another group of individuals approached. There is conflicting testimony about who was in this second group, but a number of witnesses identified Mahkuk as being one of the people in the group. The testimony from these witnesses did not, however, provide a clear picture of what role, if any, Mahkuk played in the events that resulted in the shootings.

On direct examination, White testified that she was talking to the victims from her balcony when she decided to let them into the building. According to White, she went to open the door to the building and was halfway down the hall when she heard two gunshots. White testified that she then ran back onto the balcony and saw "the Indian boys shooting them." White clarified that the "boys" she was referring to were McFarlane, Williams, and Mah-

kuk. Although White testified on direct examination that she saw all three of the individuals shooting at the victims, on cross-examination, she confirmed that immediately after the shooting she told police that she did not know who shot Burns but that she knew that "there was two of them shooting towards him." She further confirmed that when the police asked her which two, she told them, "I just seen Vinny and Mike shooting towards Joey."

Anthony Jackson also placed Mahkuk at the scene. Jackson testified that Mahkuk and McFarlane were with Williams and that Mahkuk had a revolver and McFarlane had an automatic pistol. In a previous statement, Jackson did not identify Mahkuk and Williams as the two assailants with McFarlane; instead, he indicated that one of the other two individuals was either Williams or Rainey. Jackson testified that he was unsure about the identity of the second person because Williams and Rainey look alike. On cross-examination, Jackson testified that he spoke with Jena White after the shooting and she told him the three assailants were McFarlane, Doug Funny, and Mahkuk, and that White later told him that Funny was not in the group, rather it was Williams.

Brino Gamboa testified that while he was standing in the courtyard, McFarlane, Mahkuk, and Williams approached. Gamboa testified that McFarlane had a gun but Mahkuk did not.

Larry Marshall, who had shared a jail cell with Mahkuk, also testified for the state. Marshall said that Mahkuk told him that when the group arrived at Little Earth they saw the victims and their friends, ran over to the group, and

"[McFarlane] had got jumped by one of them and [Rainey] had got jumped by one of them * * * so they just gunned them down." Marshall further testified that Mahkuk told him that he and his friends were mad at Gamboa for stealing guns and money from them.

McFarlane and Williams were also charged with the murders of Burns and Benjamin. McFarlane, whose trial had not taken place at the time of Mahkuk's trial, did not testify at Mahkuk's trial. Subsequently, however, McFarlane took the stand at his own trial and testified in his defense that he went to Little Earth with Rainey and Mahkuk. McFarlane testified that Burns approached Rainey and began wrestling with him. According to McFarlane, Rainey then pulled a gun and began shooting. McFarlane testified that he had no knowledge that Rainey was going to shoot someone. McFarlane also testified that Williams was not present during the shooting. McFarlane gave essentially the same testimony at Williams' trial, which also took place after Mahkuk's. Both McFarlane and Williams were acquitted.

I.

We first address Mahkuk's claim that the trial court erred in instructing the jury on aiding and abetting first-degree murder. During Mahkuk's trial, the court twice instructed the jury on aiding and abetting, first in its preliminary instructions to the jury given before the state opened its case and then in its final instructions given after both parties rested. Over defense counsel's objection, the court declined to use only the standard CRIMJIG [1] for aiding and abetting and instead

---

1. The standard CRIMJIG for liability for crimes of another reads as follows:

The defendant is guilty of a crime committed by another person when the defen-

dant has intentionally aided the other person in committing it, or has intentionally advised, hired, counseled, conspired with,

gave an instruction that, in part, tracks the standard CRIMJIG for aiding and abetting,[2] but includes the following *additional language:*

> In determining whether the defendant intentionally aided and abetted in the commission of the crimes charged, you may consider the following factors:
>
> The defendant's companionship and association with the other participants in the crime before, during, and after its commission;
>
> The defendant's conduct before, during, and after the crime;
>
> Whether the defendant knew that a crime was going to be committed by the other participants;
>
> Whether the defendant took reasonable steps to prevent the crime from being committed;
>
> Whether the defendant intended his presence or acts to encourage or further the completion of the crime by the other participants;
>
> And any other common sense factor that leads you to conclude that the defendant was a knowing participant in the commission of the crime.

Mere presence at the scene of a crime, without more, is not enough for you to impose liability under the aiding and abetting law. Such a person is merely a witness. However, a person's presence does constitute aiding and abetting if it is done intentionally and if it also aids or encourages the commission of the crime to any degree.

Mahkuk asserts that the court's aiding and abetting instructions "improperly highlighted evidence supporting the state's theory of the case and were confusing, misleading, and inaccurate." Mahkuk also asserts that by including knowledge and intent in the list of factors the jury need only consider, the court relieved the state of its burden to prove his knowledge and intent beyond a reasonable doubt. Further, Mahkuk asserts that the last paragraph of the instruction misstated the law. Mahkuk argues that the erroneous instruction significantly influenced the jury's verdict thus warranting a new trial. The state asserts that the court's instructions fairly and correctly stated Minnesota law.

 Trial courts have considerable latitude in choosing jury instructions. *State v. Baird,* 654 N.W.2d 105, 113 (Minn.

---

or otherwise procured the other person to commit it.

\* \* \* \*

The defendant is guilty of a crime, however, only if the other person commits a crime. The defendant is not liable criminally for aiding, advising, hiring, counseling, conspiring, or otherwise procuring the commission of a crime, unless some crime (including an attempt) is actually committed.

10 Minn. Dist. Judges Ass'n, Minnesota Practice—Jury Instruction Guides, Criminal, CRIMJIG 4.01 (5th ed.2006).

2. This portion of the court's instruction tracks the standard CRIMJIG for aiding and abetting:

> In all four counts of the Indictment, the defendant is charged with what we call

"aiding and abetting" in the commission of the crimes. In Minnesota, a defendant can be held liable for a crime even though another person or persons actually commits the criminal acts, provided the defendant intentionally aids, advises, hires, counsels, conspires with, or otherwise procures someone else to commit the crime. This is called "aiding an[d] abetting".

In order to aid and abet another in the commission of a crime, it is necessary that the defendant voluntarily associate with the criminal venture in some way, and voluntary [sic] participate in it as he would in something that he wishes to bring about. In other words, he must voluntarily seek, by some act or omission of his, to make the criminal venture succeed.

2002). We will not reverse a trial court's decision on jury instructions unless the trial court abused its discretion. *State v. Persitz*, 518 N.W.2d 843, 848 (Minn.1994). "An instruction is error if it materially misstates the law." *State v. Moore*, 699 N.W.2d 733, 736 (Minn.2005). "Erroneous jury instructions merit a new trial 'if it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict.'" *State v. Valtierra*, 718 N.W.2d 425, 433 (Minn.2006) (quoting *State v. Olson*, 482 N.W.2d 212, 216 (Minn. 1992)). A jury instruction that eliminates a required element of the crime is error that is not harmless beyond a reasonable doubt. *State v. Hall*, 722 N.W.2d 472, 479 (Minn.2006).

Minnesota Statutes § 609.05 (2006) reads as follows:

> Subdivision 1. Aiding, abetting; liability. A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.
>
> Subd. 2. Expansive liability. A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended.

Thus, to prove that Mahkuk aided and abetted the shooting and killing of the two victims, the state was required to prove more than Mahkuk's intentional presence at the scene of the crime. The state had to prove, beyond a reasonable doubt, that Mahkuk knew that his alleged accomplices were going to commit a crime and that Mahkuk intended his presence or actions to further the commission of that crime. *See State v. Gates*, 615 N.W.2d 331, 337 (Minn.2000) (explaining that "[t]o impose liability for aiding and abetting, the state must show that the defendant played a *knowing role* in the commission of the crime" (emphasis added)).

The trial court's instruction to the jury on accomplice liability generally tracked section 609.05, subdivisions 1 and 2, and the standard CRIMJIG on accomplice liability. In addition, however, the court went on to instruct that, in determining whether the defendant aided and abetted the murders, the jury could *consider* "[w]hether the defendant knew that a crime was going to be committed by the other participants" and "[w]hether the defendant intended his presence or acts to encourage or further the completion of the crime by the other participants." Although, as a general matter we believe it is wiser for trial courts to avoid giving instructions on particular kinds of evidence, in this case it was not improper for the trial court to provide the jury with a list of factors to consider because the list was balanced and neutrally phrased. *See, e.g., State v. Olson*, 482 N.W.2d 212, 216 (Minn. 1992). But the problem with the instruction here is that, whether the defendant knew that a crime was going to be committed and whether the defendant intended his presence to encourage or further the completion of the crime are not mere factors for the jury to consider, they are facts the jury had to find beyond a reasonable doubt. Thus, to find Mahkuk guilty, the jury could not simply "consider" whether Mahkuk knew a crime was going to be committed and whether he intended his presence to encourage or further the murder of Burns and Benjamin, the jury had to find that the state proved those facts beyond a reasonable doubt. Therefore, in instructing the jury that it need only *consider* Mahkuk's knowledge and intent, the court erred.

The court compounded that error when it instructed the jury that the defendant's presence "constitute[s] aiding and abetting if it is done intentionally and if it also aids or encourages the commission of the crime to any degree." This instruction allowed the jury to find Mahkuk guilty if it found that Mahkuk was intentionally present at the scene of the crime without also finding that it was Mahkuk's intent that his presence aid or encourage the commission of the crime. Thus, the instruction relieved the state of its burden to prove that Mahkuk intended his presence to further the commission of the crime and was therefore erroneous. In addition, the two instructions were also likely confusing to the jury because they were in conflict with that part of the instruction that contained the standard CRIMJIG on aiding and abetting. Although the first part of the court's instruction stated that the jury could consider whether Mahkuk's presence at the scene of the crime was intentional and whether his presence intentionally aided or encouraged the criminal act, the second part of the court's instruction allowed the jury to find guilt if it found that Mahkuk's presence was intentional regardless of whether he intended his presence to further the commission of a crime. We believe that the inconsistency in the court's instruction potentially confused the jury.

■■■■■ Our conclusion that the trial court erred in instructing the jury on aiding and abetting does not lead automatically to a new trial. An erroneous jury instruction does not require a new trial if the error was harmless beyond a reasonable doubt. *State v. Kuhnau*, 622 N.W.2d 552, 558–59 (Minn.2001). A jury instruction given in error is harmless only "if it can be said that, beyond a reasonable doubt, the error had no significant impact on the verdict rendered." *Hall*, 722 N.W.2d at 477.

In *Hall*, we noted that "[w]e have consistently held that when an erroneous jury instruction eliminates a required element of the crime this type of error is not harmless beyond a reasonable doubt." *Id.* at 479. Here, the court's instructions relieved the state of its burden of proving that Mahkuk aided and abetted the killing of Burns and Benjamin by instructing the jury that it need only consider, not find beyond a reasonable doubt, whether Mahkuk had knowledge that a crime was going to be committed and whether Mahkuk intended for his presence to encourage or further the completion of that crime. The court's instructions left the jury with the impression that Mahkuk's intentional presence was sufficient to find guilt without also requiring the jury to find that he intended his presence to encourage or further the commission of the crime. For those reasons, we cannot say that the errors were harmless beyond a reasonable doubt.

Therefore, we reverse Mahkuk's convictions and remand for a new trial.

## II.

Because we hold that Mahkuk is entitled to a new trial as a result of the erroneous jury instructions, we need not reach the remaining issues raised in his appeal, but do so to provide guidance for any retrial. We first address Mahkuk's assertion that the trial court's partial closure of the courtroom violated his constitutional right to a public trial. At some point after Jena White completed her testimony, the state raised the issue of witness intimidation. Specifically, the state indicated that it was "concerned because there [had] been allegations by the witnesses of intimidation by the Native Mob gang members." Of particular concern to the state was the presence of Mahkuk's brother, an allegedly high-ranking member of the Native Mob,

and another relative in the courtroom. In support of its request for a partial closure, the state argued that White was intimidated and offered as evidentiary support her demeanor while testifying and comments she made after testifying. The state made the following argument to the court:

> It was very clear to me by Ms. White's behavior on the stand, her sort of refusal to testify about some things she had testified about at the Grand Jury, although she ultimately did testify about those, some of her behaviors, and certainly from talking to her afterwards, that she felt intimidated by them being in the courtroom.

As part of its request, the state offered to have an officer familiar with the Native Mob sit in the courtroom to identify members of the Native Mob to be excluded.

Defense counsel objected to the state's request, noting that the state had not produced any police reports or other evidence demonstrating witness intimidation. Defense counsel also noted that the state had provided no "concrete [evidence] as to who got intimidated and when that happened." With respect to White's testimony, defense counsel argued that there was no evidence that White had been influenced by intimidation. Finally, defense counsel noted that Mahkuk's family had a right to be in the courtroom and that there was no evidence that anyone in Mahkuk's family had done anything to intimidate witnesses.

The trial court granted the state's request and allowed a plainclothes officer to be present in the courtroom for the purpose of identifying members of the gangs involved in the case who were to be excluded. The court limited its closure ruling to the testimony of lay witnesses who resided in the affected community and who were likely to know and be intimidated by the gang members. The court offered the following explanation for its ruling:

> The reason I am making this ruling is because the whole subject of this case is the alleged conflict between these two gangs. And based on the testimony I heard yesterday as well as [the prosecutor's] representations about the intimidation that's been going on outside of the charged matters, I think intimidation is a factor and therefore will permit officers to observe the proceedings for the purpose of identifying for the Court and the participants people that are known gang members.

Subsequent to the court's ruling, and again over defense counsel's objection, the trial court permitted officers to exclude Mahkuk's brother and a cousin from the courtroom. In making the objection, defense counsel argued: "There has been nothing presented to the Court that substantiates anything other than rumor and innuendo, and nothing that has anything to do with my client nor his family."

We review questions of constitutional law de novo. *State v. Shattuck*, 704 N.W.2d 131, 135 (Minn.2005) (internal quotation marks omitted). The Sixth Amendment to the U.S. Constitution and Article I, section 6, of the Minnesota Constitution provide that "the accused shall enjoy the right to a * * * public trial." U.S. Const. amend. VI; Minn. Const. art. I, § 6. The U.S. Supreme Court has explained that

> " '[t]he requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.' "

*Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). The Court has explained, however, that a de-

fendant's right to a public trial is not absolute and may give way when: (1) "the party seeking to close the hearing * * * advance[s] an overriding interest that is likely to be prejudiced"; (2) the closure is no broader than necessary to protect that interest; (3) the court has considered reasonable alternatives to closing the hearing; and (4) the court "make[s] findings adequate to support the closure." *Id.* at 48, 104 S.Ct. 2210; *see also State v. Fageroos*, 531 N.W.2d 199, 201 (Minn.1995) (adopting the *Waller* standard). Although some federal circuit courts of appeals apply a lesser "substantial reason" test to review the constitutionality of partial closures, *see, e.g., Garcia v. Bertsch*, 470 F.3d 748, 752–53 (8th Cir.2006), we have not applied different tests to complete versus partial closures. *See Fageroos*, 531 N.W.2d at 201–03 (applying the *Waller* standard to a case in which the court closed the courtroom during the testimony of two witnesses).

Based on our review of the record, we conclude that the *Waller* standard for closing the courtroom has not been met. The problem is that, while Mahkuk acknowledges, as he must, that "[p]rotecting witnesses from intimidation or retaliation is an overriding state interest," there is no evidence from any witness asserting that a witness had been intimidated or threatened. Nor is there any evidence indicating who specifically was intimidating or threatening witnesses or what the nature of the intimidation and threats was. Further, with the exception of White, there is no indication as to which specific witnesses had been intimidated or threatened. The only thing in the record regarding intimidation and threats made against witnesses consists of the prosecutor's assertions that White expressed to her that she was intimidated and the prosecutor's assertions that Native Mob members had engaged in conduct that was intended to intimidate the witnesses. The prosecutor's assertions,

however, are not evidence. Although the record does indicate that the trial court based its decision, at least in part, on the court's observation of White's testimony, there is no indication in the record as to what it was about White's testimony that supported the closure. Interestingly, with respect to White, the only person identified as having been intimidated and threatened, her testimony was completed before the trial court's closure order went into effect.

The state also asserts that the court relied on testimony from one of the state's gang experts who testified about "crimes committed by the gangs [involved in this case] and the tensions between them." But the trial court did not make specific findings as to what it was about that testimony that supported the closure decision. Moreover, closure of a trial based on generalized gang expert testimony would allow closure in virtually every trial involving allegations of gang involvement. Determining whether the closure was no broader than necessary and whether there were reasonable alternatives to closure is also made more difficult, if not impossible, by the lack of specific findings by the trial court with respect to specifically who was intimidating and threatening witnesses, which witnesses other than White were being intimidated or threatened, and what the nature of the intimidation and threats was. We therefore conclude that the trial court failed to make findings adequate to support its closure decision. We are not saying that closure may not have been warranted. We are simply saying that, absent evidence in the record and adequate findings by the trial court, we cannot say that the closure decision by the trial court was proper.

### III.

Mahkuk also asserts that the trial court erred in allowing Officer Setzer, the state's

gang expert, to testify on the following topics: (1) Mahkuk's membership in the Native Mob; (2) the rivalry between the Native Mob and the Project Boyz gang; and (3) the specific reason why the victims may have been targeted. The state asserts that Officer Setzer's testimony was helpful to the jury and that the trial court's limitations on Officer Setzer's testimony complied with our previous decisions regarding the admission of gang expert testimony.

■■■ We review the trial court's evidentiary rulings for an abuse of discretion, and will not reverse a trial court's findings unless those findings are clearly erroneous. *State v. Starkey*, 516 N.W.2d 918, 925 (Minn.1994). " 'Reversal is warranted only when the error substantially influences the jury's decision.' " *State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn.2003) (original citation omitted). Under Minn. R. Evid. 702, expert testimony is admissible if it will assist the jury in evaluating evidence or resolving factual issues. Minnesota Rule of Evidence 704 permits opinion testimony on the ultimate issues for trial. However, Minn. R. Evid. 403 provides that otherwise admissible evidence, such as expert testimony, should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

■■■ We have addressed the use of gang expert testimony in five recent cases:

*State v. Martinez*, 725 N.W.2d 733 (Minn. 2007); *State v. Jackson*, 714 N.W.2d 681 (Minn.2006); *State v. Blanche*, 696 N.W.2d 351 (Minn.2005); *State v. DeShay*, 669 N.W.2d 878 (Minn.2003); and *State v. Lopez–Rios*, 669 N.W.2d 603 (Minn.2003). To be admissible, gang expert testimony "must add precision or depth to the jury's ability to reach conclusions about matters that are not within its experience." *DeShay*, 669 N.W.2d at 888. When feasible, it is best to use firsthand knowledge to establish the for-the-benefit-of-a-gang element. *Id.* at 886. Similarly, we have advised against the use of expert testimony to prove the gang membership of the defendant by expert opinion. *Lopez–Rios*, 669 N.W.2d at 612–13.

In this case, as in the five above-cited cases, the state used the gang expert testimony to meet its burden on the elements required to prove that the crime was committed for the benefit of a gang under Minn.Stat. § 609.229.[3] Based on our careful review of Officer Setzer's testimony, we are satisfied that his testimony did not exceed the permissible scope of gang expert testimony as set out in our case law.

### IV.

Next we address Mahkuk's claim that the trial court abused its discretion in ruling that the state could elicit testimony regarding his previous arrest for illegal possession of a firearm. The court held a

---

**3.** To prove the for-the-benefit-of-a-gang offense, the state must establish that the gang being benefited meets the statutory definition of a criminal gang and that the defendant committed the crime "for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang, with the intent to promote, further, or assist in criminal conduct by gang members." Minn.Stat. § 609.229, subds. 1, 2.

Section 609.229 defines a "criminal gang" as

any ongoing organization, association, or group of three or more persons * * * that: (1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9 [including murder, assault, burglary, kidnapping, manslaughter, robbery, and drive-by shooting]; (2) has a common name or common identifying sign or symbol; and (3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.
Minn.Stat. § 609.229, subd. 1.

*Rasmussen* hearing during which the state introduced evidence through Officer John LaLuzerne, who had arrested Mahkuk in August 2004. During the course of the arrest, Mahkuk made a number of voluntary statements indicating that he was a member of the Native Mob, that the Native Mob was taking over, and that if he had had enough ammunition he would have "mowed down" the arresting officers. Over defense counsel's objection, the court ruled that the officer could testify at trial about the statements Mahkuk made at the time of his arrest, with the exception of Mahkuk's threats against the police. Specifically, the court ruled that Officer LaLuzerne's testimony regarding Mahkuk's admission that he was a member of the Native Mob and that the Native Mob was taking over was relevant to the issues in the case, but that Mahkuk's threat to the officers was inadmissible. Although the court did not specifically address the prejudicial effect of Mahkuk's statements, the fact that the court excluded Mahkuk's threat to the officers demonstrates that the court engaged in the balancing required under Minn. R. Evid. 403.

The court also ruled that Officer LaLuzerne could testify that Mahkuk's previous arrest was for illegal possession of a firearm. The court found that the evidence regarding Mahkuk's previous arrest was relevant to proving the third part of section 609.229's definition of a "criminal gang"—that the gang "includes members who individually or collectively engage in or have engaged in a pattern of criminal activity."

Mahkuk subsequently stipulated to the fact that the Native Mob is a criminal gang. As a result, the evidence indicating that the arrest was for gun possession was not admitted at trial. Nonetheless, Mahkuk asserts that, by ruling that evidence of his previous arrest was admissible, the court denied him a fair trial because he was compelled to stipulate that the Native Mob is a criminal gang to prevent the jury from learning of the arrest. Mahkuk further asserts that the probative value of the evidence was outweighed by its potential for unfair prejudice.

Under Minn. R. Evid. 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Minn. R. Evid. 403. Unfair prejudice results from "evidence [that] persuade[s] by illegitimate means, giving one party an unfair advantage." *State v. Schulz,* 691 N.W.2d 474, 478 (Minn.2005). If the evidence is admitted in error, there must be "actual prejudice to the defendant's case in order to reverse the district court and provide relief." *Id.* at 477.

In proving that the Native Mob met the definition of a "criminal gang" under section 609.229, the state had to prove that its members individually or collectively engaged in a pattern of criminal activity. Accordingly, the trial court's determination that Mahkuk's previous arrest for illegal possession of a firearm was relevant to whether the Native Mob is a criminal gang and was not an abuse of discretion. Furthermore, Mahkuk has failed to demonstrate how admission of his previous arrest would have amounted to "persuasion by illegitimate means." For those reasons, we see no error with the trial court's ruling.

V.

Mahkuk also asserts that the trial court abused its discretion by declining to compel the state to accept his proposed stipu-

lation that he was a member of a criminal gang. During the trial, Mahkuk's attorney indicated to the court and the prosecutor that Mahkuk might be willing to stipulate to his membership in the Native Mob; however, the prosecutor stated that she was not inclined to accept Mahkuk's stipulation. The court responded by stating that it would not require the state to accept Mahkuk's stipulation. During trial, the state offered admissions made by Mahkuk and photographs of Mahkuk with members of the Native Mob to prove Mahkuk's gang membership. According to Mahkuk, that evidence "had great potential for unfair prejudice because it * * * implied he knew of and had been complicit in other unrelated criminal activity committed by the gang." Given the potential for prejudice, Mahkuk asserts that the court abused its discretion when it did not accept his stipulation and allowed the state to offer evidence demonstrating his membership in the Native Mob.

As a general rule, a criminal defendant's judicial admission or offer to stipulate does not necessarily take away the state's right to offer evidence on a point. *State v. Davidson,* 351 N.W.2d 8, 10 (Minn.1984). There is, however, an exception to this rule in those cases in which the evidence is unduly prejudicial and "without relevance beyond the defendant's judicial admission." *Id.* In those cases, the prejudicial evidence "should not be received." *Id.* In *Davidson,* the defendant was charged with felony possession of a handgun and the trial court refused to accept Davidson's stipulation that he had a previous felony conviction, which if accepted would have removed the element that he was a felon from the jury. *Id.* In evaluating whether Davidson's case warranted application of the exception to the general rule, and thus whether the trial court's refusal to accept the stipulation

was error, we explained that when the potential for unfair prejudice is high: "the correct approach under the Rules of Evidence in a case such as [Davidson's is] to compare the potential of the evidence for unfair prejudice with the relevance of the evidence to issues other than the issue to which the stipulation relates." *Id.* at 11–12.

The state's evidence—Mahkuk's admissions and the photographs of Mahkuk with other members of the Native Mob—although having the potential to be unduly prejudicial, was relevant to prove Mahkuk's membership in the Native Mob; therefore, because Mahkuk was willing to stipulate to his membership, the issue is whether the state's evidence was relevant to prove any other material fact. Section 609.229, subdivision 2, requires the state to prove that the defendant committed the crime "for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang, with the intent to promote, further, or assist in criminal conduct by gang members." Thus, if the state's evidence implied, as Mahkuk asserts, that Mahkuk was "complicit in other unrelated criminal activity committed by the gang," that evidence could be relevant to proving that Mahkuk aided and abetted the murder of Burns and Benjamin because he acted with "intent to promote, further, or assist in criminal conduct by gang members."

As such, Mahkuk's stipulation that he was a member of the Native Mob was not sufficient to exclude all the state's evidence as irrelevant and thus the trial court did not abuse its discretion in declining to accept it. Even if the state's evidence of Mahkuk's membership in the Native Mob was not relevant to any other issue, Mahkuk would still have to demonstrate that he was prejudiced by the admission of the state's evidence, which he cannot do given

his statements to Officer LaLuzerne and the numerous lay witnesses who testified to his membership in the Native Mob. Accordingly, we conclude that the trial court did not abuse its discretion on this issue.

## VI.

The final argument Mahkuk raises in his direct appeal is that the trial court abused its discretion in declining to declare a mistrial after Officer Setzer testified that Mahkuk had talked to him about the Native Mob's possession of firearms. Before Officer Setzer's testimony, the trial court specifically limited the scope of his testimony by prohibiting him from testifying about the Native Mob's possession of guns. The court made the following statement, "It's unnecessary, I believe, in Officer Setzer talking about the defendant's statements about other crimes committed by other members of the gang or his own, to be specific other than to say that he had such knowledge." Defense counsel clarified the court's limitation by asking whether that precluded Officer Setzer from mentioning guns, to which the court replied yes. After soliciting Officer Setzer's opinion that Mahkuk was a member of the Native Mob, the state asked Officer Setzer if Mahkuk told him what "they had been doing." Officer Setzer replied, "He talked about a variety of gang activity, but he talked about possession of firearms."

Defense counsel objected to Officer Setzer's reference to firearms and the trial court sustained the objection. Defense counsel subsequently moved for a mistrial. The court ruled that the reference was not so prejudicial as to warrant a mistrial and gave the following curative instruction to the jury before closing arguments: "[T]here were times during the trial where I sustained objections to evidence, and in those instances, if I did sustain an objection, you should disregard the question

and the answer. It's not considered evidence in the trial." Mahkuk asserts on appeal that Officer Setzer's reference to firearms denied him a fair trial and that the state "must shoulder full responsibility for Setzer's improper testimony."

 "This court reviews a trial court's denial of a motion for a mistrial for abuse of discretion." *State v. Manthey,* 711 N.W.2d 498, 506 (Minn.2006). "[A] mistrial should not be granted unless there is a reasonable probability that the outcome of the trial would be different" if the event that prompted the motion had not occurred. *State v. Spann,* 574 N.W.2d 47, 53 (Minn.1998).

 Given the fact that Officer Setzer's comment was brief (two words in nearly 1,000 pages of transcript), that the court sustained defense counsel's objection, and that the court gave a curative instruction that did not draw attention to the inadmissible statement, we conclude that the outcome of the trial would not have been different if Officer Setzer had not made the reference to firearms. Accordingly, the trial court did not abuse its discretion in declining to declare a mistrial.

 That said, we find Officer Setzer's reference to firearms during his testimony extremely troubling. Based on the record, we cannot determine whether his violation of the trial court's order was intentional or not; nonetheless, it was misconduct attributable to the prosecutor. *See State v. Huffstutler,* 269 Minn. 153, 156, 130 N.W.2d 347, 348 (1964) ("The fact that the prejudicial information was volunteered by the witness does not render it less harmful to [the] defendant. The prejudicial testimony came from the state's witness, a public official, and the prosecution is entirely responsible for its presence in the record."); *see also State v. Underwood,* 281 N.W.2d 337, 342 (1979) (stating that the state has a duty to prepare its witness). Because we reverse on other

grounds, we need not decide whether the misconduct was intentional. We caution, however, that if we were to conclude that violation of the trial court's order was intentional, the appropriate remedy might well be reversal even having concluded that the misconduct was not prejudicial. *See, e.g., State v. Salitros,* 499 N.W.2d 815, 820 (Minn.1993) (exercising our "supervisory power over the trial courts and in the interests of justice" to reverse a conviction when the prosecutor committed misconduct).

Because we conclude that Mahkuk is entitled to a new trial, we need not determine whether the newly available testimony of his alleged accomplice entitled him to postconviction relief.

Reversed and remanded for a new trial.

## CONCURRENCE

MEYER, Justice (concurring).

Although I concur with the decision of the majority that the district court's erroneous jury instruction requires the reversal of Mahkuk's convictions and a remand for a new trial, I write separately to address the standard that the district court should apply when there is a partial closure of a criminal trial.

The right to a public trial exists to ensure that the "judge and prosecutor carry out their duties responsibly," to encourage "witness[es] to come forward," and to discourage perjury. *Waller v. Georgia,* 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). The Supreme Court has recognized that while the right to a public trial is an important constitutional right, there are some instances when that right gives way to the need to close the trial to the public. *Id.* at 48, 104 S.Ct. 2210. Under the rule articulated by the Supreme Court, a trial may be closed when: (1) "the party seeking to close the hearing * * * advance[s] an overriding interest that is likely to be prejudiced"; (2) the closure is no

broader than necessary to protect that interest; (3) the court has considered reasonable alternatives to closing the hearing; and (4) the court "make[s] findings adequate to support the closure." *Id.*

*Waller* addressed a complete closure of a trial—one in which the public was excluded entirely. *Id.* at 42, 104 S.Ct. 2210. In contrast, a partial closure is one that " 'results in the exclusion of certain members of the public while other members of the public are permitted to remain in the courtroom.' " *State v. Garcia,* 561 N.W.2d 599, 605 (N.D.1997) (quoting *State v. Sams,* 802 S.W.2d 635, 639–40 (Tenn.Ct. Crim.App.1990)). Where there is only a partial closure of the trial, many courts have adopted a "substantial reason" standard to determine whether the Sixth Amendment rights of the defendant have been violated. *See, e.g., Garcia v. Bertsch,* 470 F.3d 748, 752–53 (8th Cir.2006) (noting that the Second, Eighth, Ninth, Tenth, and Eleventh Circuits all apply the "substantial reason" test to partial closures). Under the "substantial reason" test, the state must establish a "substantial reason" why it is likely to be prejudiced if the trial is not closed instead of showing that it has an "overriding interest" in closing the hearing. After the state establishes that it has a "substantial reason" for the closure, there must still be a showing that: (1) the closure is no broader than necessary to protect that interest; (2) the court has considered reasonable alternatives to closing the hearing; and (3) the court has made findings adequate to support the closure. *See Woods v. Kuhlmann,* 977 F.2d 74, 76–77 (2d Cir.1992); *United States v. Sherlock,* 962 F.2d 1349, 1358–59 (9th Cir. 1992).

This partial closure rule has been adopted because the defendant's right to a public trial is less likely to be violated during a partial closure because "a partial closure does not 'implicate the same secre-

cy and fairness concerns that a total closure does.'" *United States v. Farmer,* 32 F.3d 369, 371 (8th Cir.1994) (quoting *Woods,* 977 F.2d at 76). A public trial is important because the courts depend upon "'the presence of interested spectators [to] keep [the defendant's] triers keenly alive to a sense of their responsibility and to the importance of their functions.'" *Waller,* 467 U.S. at 46, 104 S.Ct. 2210 (quoting *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 380, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979)). A partial closure, where only certain members of the public are excluded from a trial, still allows for: interested spectators to observe the judicial system, the improvement of quality of testimony, the inducing of unknown witnesses to come forward with relevant testimony, insuring that the trial judge and prosecutor perform their duties responsibly, and discouraging perjury.

The majority suggests that *State v. Fageroos,* 531 N.W.2d 199 (Minn.1995), mandates that we apply the standard articulated in *Waller* to both complete and partial closures of trials. I do not believe that *Fageroos* has conclusively addressed the issue.

Although *Fageroos* applied the *Waller* standard to a partially closed trial, the focus of *Fageroos* was on whether the trial court's findings were sufficient to support the need for closure. 531 N.W.2d at 202. The *Fageroos* court did not specifically address the question of whether different standards should apply when there is a partial closure of the trial rather than a complete closure. Because this issue was not addressed in *Fageroos,* the question of what standard should be applied to partial closures of trials has not been decided by this court, and I would adopt the substantial reason test instead of the *Waller* overriding interest standard.

I concur in the decision of the majority because even under the "substantial rea-

son" standard, I would conclude that the standard for closing the courtroom in this case has not been met. There is no testimony or evidence from any witness indicating that he or she has been intimidated or threatened. Nor is there evidence indicating who was intimidating or threatening witnesses or the nature of those threats. In fact, other than her demeanor while testifying, there is no testimony from White indicating that she felt intimidated or threatened. Instead, the record simply contains statements from the prosecution indicating that White felt intimidated. That is not evidence. Without specific findings about who was being intimidated and the nature of the intimidation, it is impossible to determine whether partial closure was proper. Therefore, I agree with the majority that we cannot conclude that the closure decision by the trial court was proper, absent evidence in the record and adequate findings by the trial court.