*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0249p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JOHN DRUMMOND,
  *Petitioner-Appellee/Cross-Appellant,*

  *v.*

MARC HOUK, Warden,
  *Respondent-Appellant/Cross-Appellee.*

Nos. 11-3024/3039

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:07-cv-1776—Sara E. Lioi, District Judge.

Argued: April 23, 2013

Decided and Filed:  August 26, 2013

Before:  COLE, GRIFFIN, and KETHLEDGE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant/Cross-Appellee.  Alan C. Rossman, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** Justin Morgan Lovett, Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant/Cross-Appellee.  Alan C. Rossman, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, David L. Doughten, Cleveland, Ohio, for Appellee/Cross-Appellant.

  COLE, J., delivered the opinion of the court, in which GRIFFIN, J., joined. KETHLEDGE, J. (pp. 19–21), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

  COLE, Circuit Judge.  John Drummond was convicted of the aggravated murder of Jiyen Dent, Jr. and sentenced to death.  He unsuccessfully pursued post-conviction

state habeas proceedings and subsequently filed a petition for a writ of habeas corpus in federal district court. The district court conditionally granted the writ in part, holding that the state trial court violated his Sixth Amendment right to a public trial and that the Supreme Court of Ohio unreasonably applied clearly established Supreme Court law when it held otherwise. The district court denied the petition as to all other grounds for relief. Marc Houk, a warden for the state of Ohio, appeals the district court's partial grant of the writ. Drummond cross-appeals the district court's denial of the writ on two grounds: (1) the state trial court proceedings violated his Confrontation Clause right to cross-examine witnesses, and (2) his counsel was ineffective during the penalty phase of his trial. For the reasons that follow, we affirm the judgment of the district court.

I.

At approximately 11:25 p.m. on March 24, 2003, Drummond fired eleven shots into the home of Jiyen Dent Sr. in Youngstown, Ohio during a drive-by shooting. One of the shots killed three-month-old Jiyen Dent Jr.

On April 3, 2003, the state of Ohio indicted Drummond on seven counts: aggravated murder with prior calculation and design; aggravated murder of an individual under thirteen years of age; two counts of attempted murder; two counts of felonious assault; and improperly discharging a firearm. The two counts of aggravated murder each contained two death penalty specifications: (1) a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons, Ohio Rev. Code Ann. § 2929.04(A)(5), and (2) murder of a child under thirteen years of age, *id.* § 2929.04(A)(9).

Presentation of evidence at the jury trial began on February 2, 2004. At trial, James "Cricket" Rozenblad, Yaraldean Thomas, and Nathaniel Morris testified for the prosecution. Rozenblad testified to overhearing Drummond, Wayne Gilliam, and another man at a party discussing a "guy moving into [their] neighborhood [who] could have had something to do with the death of [fellow Lincoln Knolls Crips member] Brett Schroeder." Thomas testified to seeing Drummond whisper with Gilliam, and at the conclusion of their discussion, hearing Drummond say, "It's on." According to Thomas,

Drummond left the party and reappeared shortly thereafter with an assault rifle. Fifteen minutes later, the fatal shots were fired. Morris, an inmate in the same cellblock as Drummond in the Mahoning County jail, testified that he had overheard Drummond tell a fellow inmate that "he didn't meant [sic] to kill the baby; he was trying to get at somebody else . . . ."

A number of other witnesses testified for the prosecution. Although some of these witnesses reported hearing gunshots, seeing Drummond, Gilliam, and Gilliam's car near the scene of the shooting, and seeing Drummond with a gun, no other witnesses reported hearing Drummond make any incriminating statements or otherwise indicate that he participated in the planning of the offense. A search of Drummond's house yielded ammunition consistent with the shooting and a variety of items tying him to the Lincoln Knolls Crips and to Schroeder.

A jury found Drummond guilty on all counts and specifications. The trial court sentenced Drummond to death, and the Supreme Court of Ohio affirmed his conviction and sentence on direct appeal. *See State v. Drummond*, 854 N.E.2d 1038, 1078 (Ohio 2006). Drummond then filed a petition for post-conviction relief in state trial court, which was denied on summary judgment. The Seventh District Court of Appeals affirmed the trial court's decision, *State v. Drummond*, No.05 MA 197, 2006 WL 3849295, at *23 (Ohio Ct. App. Dec. 20, 2006), and the Supreme Court of Ohio declined to accept the case for review. *State v. Drummond*, 866 N.Ed.2d 512 (Table) (Ohio 2007).

Drummond then filed a petition for a writ of habeas corpus in federal district court in October 2007, alleging thirteen grounds for relief. In December 2010, the district court granted the writ in part, holding that the state trial court violated Drummond's Sixth Amendment right to a public trial. *Drummond v. Houk*, 761 F. Supp. 2d 638, 680 (N.D. Ohio 2010). The district court denied the writ as to all other grounds for relief. *Id.*

Houk now appeals the district court's partial grant of the writ. Drummond cross-appeals the district court's denial of the writ on the grounds that (1) the state trial court

proceedings violated his constitutional right to cross-examine witnesses, and (2) his counsel was ineffective during the sentencing phase.

## II.

We review the district court's grant of a writ of habeas corpus de novo, but we review any factual findings for clear error. *Carter v. Bell*, 218 F.3d 581, 590 (6th Cir. 2000). The factual findings of the state court "are presumed [to be] correct and may be rebutted only by clear and convincing evidence." *Bray v. Andrews*, 640 F.3d 731, 734 (6th Cir. 2011) (internal quotation marks omitted).

Because Drummond's habeas petition was filed in 2007, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 22 U.S.C. § 2254, applies and we may not grant relief "unless . . . the . . . state court's decision was contrary to" then clearly established Supreme Court law; "or . . . it involved an unreasonable application of such law; or . . . it was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (citations omitted) (internal quotation marks omitted); *see also* 28 U.S.C. § 2254(d). Supreme Court cases decided after the state court decision may not be considered by a reviewing court. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Under § 2254(d)(1), we may grant the writ if we find that the state court came to "a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decide[d] a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. The "clearly established Federal law" language of § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of" the Supreme Court. *Id*. at 412. Relief will be granted if the state court "identifie[d] the correct governing legal principle . . . but unreasonably applie[d] that principle to the facts" of the case. *Id*. at 413. The facts of a relevant Supreme Court case need not be identical to the case in which the law is being applied. *Id.* at 407 (holding that it is an unreasonable application of Supreme Court "precedent if the state court . . . unreasonably refuses to extend [a legal principle] to a new context where it should apply.").

In conducting our review the "proper inquiry" is "whether the state court decision was objectively unreasonable and not simply erroneous or incorrect." *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) (citing *Williams*, 529 U.S. at 409-11.)  In other words, "in applying the 'unreasonable application' clause, a reviewing court must be careful not to substitute its own judgment for that of the state court." *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008).

III.

The state trial court closed the courtroom on two separate occasions during Drummond's trial: during part of the day on February 4th and during part of the day on February 5th.  The trial closure relevant to this appeal occurred on February 4th from approximately 1:30 p.m. until the court adjourned that day.  The trial court explained:

> Ladies and gentlemen that are here to watch the trial, the Court is going to clear the courtroom for the remainder of the afternoon.  You are invited back tomorrow morning at 9 o'clock in the morning. Okay? Deputies, clear the courtroom.  And leave the building, not only to leave the courtroom but leave the building.  See everybody tomorrow at 9:00.

After the courtroom was cleared of spectators, and still outside the presence of the jury, the trial court explained the reasons for the partial closure:

> The Court:  It's come to the attention of the Court that some of the jurors—or witnesses feel threatened by some of the spectators in the court.  The Court's making a decision that until we get through the next couple of witnesses I'm going to clear the courtroom.  That includes the victim's family, the defendant's family and all other spectators.  The Court had two incidents yesterday involving one of the spectators where he showed total disrespect to the Court in chambers and gave the deputies a very hard time.  I didn't hold him in contempt of court, but just after that then another individual—there was a physical altercation between that individual who also came to watch the trial.  His name's Damian Williams . . . . Who ultimately got charged with assault on a peace officer.  So over the objection of the defendant I'm clearing the courtroom just for today only.  Mr. Gentile?
>
> [Defense Counsel] Mr. Gentile:  Yes, your Honor.  We would object to the Court's ruling.  The defendant is entitled to a public trial under the United States Constitution.  I don't disagree that there has been some sort

of misconduct here that has been brought to my attention. However, that has not been attributable to the defendant, to Mr. Drummond, and we, therefore, don't think that he should be punished in terms of not having the support, . . . [of] his family, that in the nature of this case, a capital case, that he would require making.

The Court: Just to perfect the record, I do believe that the one individual who was not charged with contempt of court yesterday, Michael Peace, is in fact John Drummond's brother.

[Prosecuting Attorney] Mr. Franken: No.

The Court: No?

Mr. Franken: Michael Peace says he's family. Others have said he isn't. He told Deputy Schmuck that he was family to Drummond. He's not a brother though.

The Court: Right. And we go back to when we were seating the jury and John Drummond approached a potential juror's husband in the jail . . . . There's been a string of things. . . . We would all agree that the media is permitted in so at least we have a record by a disinterested outside source.

Mr. Gentile: Yes, Your Honor.

The Court: Let me see the prosecutor . . . . I'm going to allow the press in at least . . . .

While the courtroom was closed, three prosecution witnesses testified: James "Cricket" Rozenblad submitted to cross-examination by Drummond's counsel, and Nathaniel Morris and Yaraldean Thomas testified on both direct and cross-examination. *Drummond*, 854 N.E.2d at 1053.

Because we now find that Drummond's Sixth Amendment right to a public trial was clearly established at the time of the Supreme Court of Ohio decision and because that law was unreasonably applied by the Supreme Court of Ohio, we affirm the judgment of the district court.

## A.

Houk's primary argument on appeal is that at the time of the Supreme Court of Ohio's decision Supreme Court law was not "clearly established." Therefore, according

to Houk, the district court erred in holding that the Supreme Court of Ohio's decision was an unreasonable application of that law.

It is uncontested that the relevant Supreme Court law here is *Waller v. Georgia*, 467 U.S. 39 (1984) and the Supreme Court of Ohio applied this case to Drummond's appeal, *Drummond*, 854 N.E.2d at 1054-56. In *Waller*, the Supreme Court addressed an accused's Sixth Amendment right to a public trial. The trial court excluded the public, including both the press and Waller's friends and family, from all seven days of a pretrial suppression hearing. *Waller*, 467 U.S. at 42. The Supreme Court held that this exclusion violated Waller's Sixth Amendment right to a public trial. *Id*. at 48. To reach this conclusion, the Court applied the four-part test from *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 510 (1984), a case determining the contours of the First Amendment right of the press to attend *voir dire*. *Waller,* 467 U.S. at 48. Under this test, "[(1)] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [(2)] the closure must be no broader than necessary to protect that interest, [(3)] the trial court must consider reasonable alternatives to closing the proceeding, and [(4)] it must make findings adequate to support the closure."[1] *Id*.

The Supreme Court found that the trial court's decision did not pass this test. It deemed the trial court's findings to be "broad and general . . . not purport[ing] to justify closure of the entire hearing." *Id.* It noted that "the State's proffer was not specific as to whose privacy interests might be infringed, how they would be infringed, what portions of the tapes [containing allegedly private information] might infringe [those privacy interests], and what portion of the evidence consisted of the tapes." *Id.* Further, the trial court had not considered alternatives, such as "directing the government to provide more detail about its need for closure, in camera if necessary, and closing only those parts of the hearing that jeopardized the interests advanced." *Id.* at 48-49. Finally,

---

[1]No showing of prejudice is required for reversal when there is a violation of the right to a public trial. *See, e.g., Arizona v. Fulminante*, 499 U.S. 279, 294-95 (1991) ("[V]iolation of the guarantee of a public trial require[s] reversal without any showing of prejudice and even though the values of a public trial may be intangible and unprovable in any particular case."); *Waller*, 467 U.S. at 49-50. Therefore, only the four-prong *Waller* test is at issue for this claim.

the Court reasoned that "the closure was far more extensive than necessary[,]" as the evidence necessitating the closure occupied less than three hours of the seven-day hearing.  *Id.* at 49.  As a remedy, the Court ordered the trial court to conduct the suppression hearing anew.  If the trial court again found the proposed evidence admissible at trial, the original verdict would stand.  *Id*. at 50.

Houk now argues that *Waller* is insufficient to create clearly established federal law for purposes of Drummond's trial because *Waller* involved a "full" or "total" courtroom closure—the court excluded all persons from the courtroom for the duration of the suppression hearing—while Drummond's trial was only a "partial" closure—the court allowed the media to remain in the courtroom (although there is no indication that any media were actually in attendance).  Therefore, according to Houk, the state court's application of the *Waller* test to Drummond's case is irrelevant because the law was not clearly established for purposes of § 2254(d)(1).

At the time of the state-court decision, the Supreme Court had not expressly analyzed the implications of a partial courtroom closure.  The case that did, *Presley v. Georgia*, 558 U.S. 209 (2010), which held that *Waller* applies equally to full and partial courtroom closures, was not decided until three years after the Supreme Court of Ohio's decision in *Drummond*, and we therefore may not consider it today.  While admitting that "the statutory standard of deference [does not] require[] a complete duplication of the facts with respect to the holding at issue," Houk nevertheless argues that, until *Presley*, federal law was not "clearly established" on partial courtroom closures for purposes of § 2254(d)(1).

It is indeed true that after *Waller* (but before *Presley*) circuit courts often drew a distinction between "full" and "partial" courtroom closures.  The courts reasoned that a partial closure did not implicate the same secrecy and fairness concerns that a total closure did.  *See, e.g. Garcia v. Bertsch*, 470 F.3d 748, 752-53 (8th Cir. 2006).  These courts generally modified the first prong of the *Waller* test and required the trial court to show a lesser standard of "substantial reason" for partial closures, as opposed to the more stringent standard of an "overriding interest."  *See, e.g., United States v. Petters*,

663 F.3d 375, 383 (8th Cir. 2011) (using a modified *Waller* test)*; United States v. Osborne*, 68 F.3d 94, 98-99 (5th Cir. 1995) (applying a modified *Waller* test for partial closures after noting that the Second, Eighth, Ninth, Tenth and Eleventh Circuits all do the same). *But see Walton v. Briley*, 31 F.3d 431, 433 (7th Cir. 2004) (applying an unmodified *Waller* test to a partial closure).**2** Houk relies on these circuit court distinctions between full and partial closures to argue that there was no clearly established law regarding partial closures at the time of the Supreme Court of Ohio opinion in *Drummond*.

This distinction between full and partial closures, however, does not carry Houk's argument very far. Notably, Houk points to no courts that do not apply *Waller* in a partial closure context—the Sixth Amendment and some form of *Waller* was applied in every case. This is true even though in many partial closure cases only a few persons were excluded from the courtroom. *See, e.g., Osborne*, 68 F.3d at 98 (applying the modified *Waller* test when only one person was excluded from the courtroom); *Woods v. Kuhlman*, 977 F.2d 74, 76 (2d Cir. 1992) (applying the modified *Waller* test when only members of the defendant's family were excluded for one witness's testimony). In the instant case, in contrast, the courtroom was almost completely cleared; only media members were allowed to remain, and it is not clear that any were actually present. In our view, it would have been unreasonable for the state court not to use the *Waller* test here. *See Williams*, 529 U.S. at 407 (holding that it is an unreasonable application of Supreme Court "precedent if the state court . . . unreasonably refuses to extend [a legal principle] to a . . . context where it should apply"). Indeed, the Supreme Court of Ohio recognized that *Waller* applied to this case and discussed the modified four-factor test in its analysis. *Drummond*, 854 N.E.2d at 1054-56.

Houk contends that under *Carey v. Musladin*, 549 U.S. 70 (2006), "clearly established federal law" is defined only by Supreme Court precedent and it is impermissible for us to consider how circuit courts have interpreted *Waller*. In

---

**2**Pre-*Presley*, we indicated, in dicta, that we would have used the unmodified *Waller* test in a partial closure scenario. *Johnson v. Sherry*, 586 F.3d 439, 445 (6th Cir. 2009).

*Musladin*, the Court held that Supreme Court law was not clearly established under circumstances in which circuit courts "diverged widely" in their interpretations of the law. *Id*. at 76. Here, however, we have the opposite situation: circuit courts with parallel holdings, all in agreement that *Waller* extends some form of Sixth Amendment protection to defendants facing partial closures. While this congruence among the circuits does not permit us to adopt any court's interpretation as authoritative, *see Williams*, 529 U.S. at 381 (holding that only Supreme Court holdings create "clearly established law" for AEDPA purposes), the unanimous circuit court consensus lends credence to our holding that the law of *Waller* was clearly applicable to partial closures just a the circuit court divergence in *Musladin* demonstrated that Supreme Court law was not clearly established. *See id*.

Houk also cites *Rodriguez v. Miller*, 537 F.3d 102 (2d Cir. 2007) ("*Rodriguez II*"), a public trial case. In the original *Rodriguez* disposition ("*Rodriguez I*") the Second Circuit granted habeas based on *Waller* interpreted through the lens of Second Circuit precedent. 439 F.3d 68, 74 (2d Cir. 2006). The Supreme Court then vacated and remanded the case for reconsideration in light of *Musladin*. *Miller v. Rodriguez*, 549 U.S. 1163 (2007). The *Rodriguez* cases do not change the disposition of this case.

In the *Rodriguez* cases, the defendant challenged the exclusion of his family from the courtroom but conceded that the exclusion of the rest of the public was consistent with *Waller*. In *Rodriguez I*, the Second Circuit held that clearly established federal law placed a particular emphasis on allowing defendants to have family in the courtroom. This holding was based on *Waller* as construed in prior Second Circuit cases. *See Rodriguez I*, 439 F.3d at 74 (citing *Yung v. Walker*, 341 F.3d 104, 111 (2d Cir. 2003)). Finding that exclusion of "family members requires stricter scrutiny than" exclusion of members of the public—something not discussed by the Supreme Court in *Waller*—the Second Circuit held that Rodriguez's Sixth Amendment right to a public trial had been violated. *Id*. at 76.

On appeal, the Supreme Court vacated and remanded this holding in light of *Musladin*. *Rodriguez*, 549 U.S. at 1163. The Second Circuit interpreted the Supreme

Court's directive on remand as an admonishment to apply only Supreme Court holdings as "clearly established federal law" under § 2254(d)(1) and that "the decisions of the courts of appeals cannot provide clearly established federal law." *Rodriguez II*, 537 F.3d at 109.  Because the Second Circuit had relied on its own precedent to differentiate Rodriguez's family from the general public, it was obligated to find that the state court had not unreasonably applied the *Waller* test on remand.  *Id*. at 109-110 (noting that "*Waller* does not demand a higher showing before excluding a defendant's friends and family" and "AEDPA is concerned only with *Waller*'s holding: that a courtroom closure must pass its four-part test").

Contrary to Houk's assertion, the *Rodriguez* cases support our holding that the law was clearly established in the instant case. *Rodriguez I* incorrectly held that the state court was bound by the Second Circuit's heightened standard for family. *See* 439 F.3d at 74. *Rodriguez II* corrected this error by acknowledging that *Waller*, and its four-part test, was the only binding law for purposes of § 2254(d)(1). 537 F.3d at 109. The *Rodriguez* cases along with *Musladin* simply stand for the principle that "the lower federal courts cannot themselves establish . . . a principle with clarity sufficient to satisfy the AEDPA bar." *Williams*, 529 U.S. at 381.  Circuit courts cannot establish new standards of law for ADEPA purposes, as the Second Circuit did by adding a new standard for families to *Waller*'s test. It is our task, however,  under § 2254(d)(1), to apply those standards which have already been established by the Supreme Court.  That is what we do today.

At the time of the Supreme Court of Ohio's decision, *Waller* clearly applied to courtroom closures whether the closure was partial or full.

B.

We next must determine if the Supreme Court of Ohio unreasonably applied *Waller* in the instant case.  *See* 28 U.S.C. § 2254(d)(1).  "Under § 2254(d), a habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a

prior decision of this Court." *Harrington,* 131 S. Ct. at 786. It is not enough for us to determine that we would have reached a different result than the Supreme Court of Ohio, habeas relief is granted only where the state court's decision is objectively unreasonable. *See id.*

Applying the modified *Waller* test, the Supreme Court of Ohio found that the trial court had satisfied all of the prongs. *Drummond*, 854 N.E.2d at 1054. The first factor is the only factor typically modified for partial closures. Under *Waller*, courts must show that there was an "overriding interest" requiring the closure. *Waller*, 467 U.S. at 45. For partial closures, however, pre-*Presley* circuit courts often only required that trial courts show a "substantial reason." *See, e.g.*, *Petters*, 663 F.3d at 383. The Supreme Court of Ohio determined that there was a substantial reason to close the courtroom because there had been several incidents raising safety concerns leading up to the closure and "the dangerous nature of gang violence" gave rise to "the genuine need to protect witnesses testifying against gang members from the deadly threat of retaliation." *Drummond*, 854 N.E.2d at 1054. It is notable that while the Supreme Court of Ohio recognized the threat of "gang violence" as a reason to justify the closure, the trial court did not make any statement to this effect in its own findings. (*See* Tr. Trans., R. 35-13, PageID#7274.)

The district court found that the Supreme Court of Ohio had unreasonably applied *Waller* because the trial court did not make specific findings on the record giving a reason for the closure. *Drummond*, 761 F. Supp. 2d at 674. In particular, "the trial court made no specific inquiries on the record about who was feeling threatened by whom," and "nowhere in the trial record is it discussed by any party which witnesses were frightened or which spectators were threatening witnesses." *Id*.

We agree with the district court. The trial court demonstrated neither an overriding interest nor a substantial reason to close the courtroom, and it was unreasonable for the Supreme Court of Ohio to find otherwise. *See Waller*, 467 U.S. at 45;*Petters*, 663 F.3d at 383. While the trial court mentioned witnesses feeling "threatened," it did not identify the witnesses nor did it identify who threatened them or

why. (Tr. Trans., R. 35-13, PageID#7275.) The record is completely silent as to whether the witnesses had a "substantial" reason for feeling threatened or if they had any grounds whatsoever for any ostensible concerns. It is not even clear that the witnesses referenced were those who testified during the time of the closure. Similarly, even if the witnesses had reasonable grounds to feel threatened, it is far from clear how closing the courtroom served to remedy those concerns. The Supreme Court of Ohio also mentioned "incidents" and a "physical altercation," but the episodes in question occurred on a different day than the trial closure and the record makes no link between these incidents and the witnesses testifying on the day of the closure. While there was one particular disturbance with a juror who could be identified, "[t]his juror was excused for cause during jury selection and thus did not participate in the trial." *Drummond*, 761 F. Supp. 2d at 675. It is therefore unclear how the purported fears of this former jury candidate could be related to the February 4th trial closure. In sum, there are no findings on the record to support the Supreme Court of Ohio's conclusion that there were "substantial reasons" for the closure and Houk has not presented any arguments in the alternative.

Applying the second prong of the *Waller* test, the Supreme Court of Ohio found that the closure was no broader than necessary because the closure was for a limited duration, the media were allowed to remain, and the trial transcript became public record. *Drummond*, 854 N.E.2d at 1054-55; *see Waller*, 467 U.S. at 48. The district court found that this holding was an unreasonable application of Supreme Court law. The record does not show the closure itself to be necessary, and even if it was necessary, the trial court did not justify clearing the entire courtroom with the exception of the press as opposed to choosing a more narrow approach. *Drummond*, 761 F. Supp. 2d at 675.

The district court held that "there were no findings that any particular witness felt threatened by any particular spectator. Likewise, there were no findings that Drummond's family posed any threat. Under such circumstances, a reviewing court cannot assess whether the trial court's closure was narrowly tailored." *Id.* at 676. The court also dismissed the argument that allowing the press to attend the trial "automatically cure[s] Sixth Amendment deficiencies," absent evidence that the press

*did* attend the trial. *See id*. at 672 (citing *Douglas v. Wainwright*, 714 F.2d 1532, 1542-43 (11th Cir. 1983)). Finding no evidence in the record that the media attended the portion of the trial from which the public was excluded, the district court announced that "[i]t would be improper for this Court to presume either the media's presence or its accurate report." *Id.* at 672-73.

On appeal Houk has not made any convincing counter arguments that would lead us to disagree with the district court's determination. It is indeed true, as the Supreme Court of Ohio found, that the closure was for a limited duration and the press was permitted to attend. Nevertheless, it is entirely unclear why this particular closure was necessary in the first place. *See Waller*, 467 U.S. at 48 ("[T]he trial court's findings were broad and general, and did not purport to justify" the breadth of the closure"). From the record, the timing and breadth of the closure appears completely arbitrary and without any justification. For example, Drummond's counsel specifically objected to the removal of his family. The prosecutor acknowledged on the record that Drummond's family had not been involved in any of the "disturbances" cited by the court. For reasons only the trial court knows, the family was removed from the courtroom anyway. Therefore, the closure was broader than necessary and it was unreasonable for the Supreme Court of Ohio to find otherwise. *See Id*.

The third *Waller* factor requires a trial court to "consider reasonable alternatives to closing the proceeding." *Id*. The Supreme Court of Ohio acknowledged that "the record does not show that the trial court considered alternatives to closure." *Drummond*, 854 N.E.2d at 1055. The court nevertheless held that because the closure was only partial, this factor had been met. *Id*.

The district court again held that this was an unreasonable application of *Waller*: "At best, the Supreme Court of Ohio implied that, in ordering a partial closure, the trial court must have considered and rejected the more rigid alternative of a complete closure. Nothing in the trial record, however, reflects that the trial court considered any alternatives." *Drummond*, 761 F. Supp. 2d at 677. The district court noted that under *Waller* the trial court was required to consider alternatives and which the Supreme Court

of Ohio acknowledged was not done in this case.  *Id*. at 677-78.  Therefore, the court held that "it was an unreasonable application of *Waller* for [the Supreme Court of Ohio] to hold that the requirement of considering alternatives was met."  *Id*. at 678.

We agree with the district court on this prong as well.  The Supreme Court of Ohio noted that no alternatives to closure were considered, even though at least one alternative was proposed by Drummond's counsel—that Drummond's family be permitted to remain in the courtroom.  Acknowledging the factor but failing to apply it is objectively unreasonable.  *See Williams*, 529 U.S. at 413 (holding that it is an unreasonable application of Supreme Court law for purposes of § 2254(d)(1) if the state court "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the . . . case.")  Therefore, this was an unreasonable application of the third *Waller* factor.

Finally, the fourth *Waller* factor requires a trial court's findings to be "adequate to support the closure."  *Waller*, 467 U.S. at 48; *see Kuhlmann*, 977 F.2d at 76-78 (applying the modified *Waller* test).  According to the Supreme Court of Ohio, the findings were sufficient:

> [T]he trial court stated that there had been a physical altercation between spectators and courtroom deputies.  The trial court also mentioned that another incident had occurred in the judge's chambers and that witnesses had expressed fear of retaliation by testifying in open court.  The trial court also identified Damian Williams and Michael Peace as involved in the earlier disturbances.  Although the trial court should have made additional findings to clarify the reasons for closing the court, the strength of the judge's actual findings must be evaluated in reference to the limited scope of the closure.  By that standard, we conclude that the trial court's findings were adequate.

*Drummond*, 854 N.E.2d at 1055.

The district court once again found that this holding was an unreasonable application of *Waller*, and we agree.  *See Drummond*, 761 F. Supp. 2d at 679.  The physical altercation and incident in chambers referred to by the Supreme Court of Ohio did not occur on the day of the closure and there is no apparent connection between

those incidents or the instigators and the witnesses testifying on February 4th. Although the trial court also noted that Drummond had approached a potential juror's husband in jail, presumably during voir dire, it is not clear how that incident could be tied to the February 4th witnesses or the closure. The sole juror whose husband had received threats had previously been dismissed from the jury pool.

Review of the record provides no indication as to which witness felt threatened—not even an oblique reference to some characteristic of a threatened witness. Thus, the trial court fell well shy of the *Waller* standard of supplying findings that are "specific enough that a reviewing court can determine whether the closure order was properly entered." *Waller*, 467 U.S. at 45 (quoting *Press-Enterprise*, 464 U.S. at 510). There was "nothing in the trial record that the Supreme Court of Ohio may have relied upon to supplement the trial court's findings that would justify the closure." *Drummond*, 761 F. Supp. 2d at 680. In other words, there were no findings at all made by the trial court that justified closing the courtroom on February 4th.

To support his appeal, Houk points to *Garcia v. Bertsch* in which the Eighth Circuit, considering the effect of a partial closure in a habeas appeal, declined to grant habeas. 470 F.3d 748 (8th Cir. 2006). The court held that the North Dakota Supreme Court's application of the modified *Waller* test to the facts of the case was not objectively unreasonable given that "[t]he Supreme Court ha[d] not spoken on the partial closure issue." 470 F.3d at 754. *Garcia*, however, is readily distinguishable. In *Garcia*, the closure involved a juvenile witness who refused to testify to a full courtroom. *Id*. at 750-51. After putting the witness on the stand unsuccessfully, the trial court proceeded to consider other options. *Id*. The court conducted a discussion on the record with a media representative and the attorneys, and then, before clearing the courtroom only as much as necessary—allowing the defendant's family to remain—the court explained its reasoning on the record. *Id*. The Eighth Circuit suggested it would have decided the case differently, but held that "the court's decision" and application of *Waller* "was not objectively unreasonable" given the facts of the case and the absence of any further clarification from the Supreme Court on partial closures. *Id*. at 754.

In contrast, we need no further clarification on the law of partial closures to determine that the Supreme Court of Ohio's decision was objectively unreasonable. In *Garcia*, the North Dakota Supreme Court offered some findings and reasoning to justify the partial closure. In Drummond's case, the trial court gave no explanations that have any rational connection to closing the trial on the afternoon of February 4th. Furthermore, in *Garcia*, the defendant's family was allowed to remain in the courtroom, rendering the closure only as broad as necessary. Drummond's family was removed from the courtroom after objection without any explanation regarding the scope of the closure from the court. In *Garcia*, the court not only considered alternatives to closure but attempted to put the juvenile witness on the stand in a full courtroom, before moving forward with the closure. The court also discussed options with the attorneys on the record. In the instant case, the court, as acknowledged by the Supreme Court of Ohio, failed to consider any alternative options. *Garcia* is therefore readily distinguishable from Drummond's case.

## C.

Finally, because the Supreme Court of Ohio denied the writ, it has provided no ruling on the proper remedy. Thus, we review de novo the district court's proposed remedy: a new trial. *Carter*, 218 F.3d at 590.

In *Waller*, the Supreme Court declined to grant Waller's request for a new trial. Rather, the Supreme Court ordered the trial court to conduct the suppression hearing anew, albeit without closing as much of the hearing to the public. The Supreme Court reasoned that "the remedy should be appropriate to the violation." *Waller*, 467 U.S. at 50. Given that the trial itself had been open to the public, ordering a new trial "would be a windfall for the defendant." *Id.* In *Waller*, ordering a new suppression hearing was the narrowest remedy for the structural error that had plagued the proceedings.

In the instant case the public-trial violation occurred during the trial itself. We have limited options to remedy a structural error occurring during the trial itself. Unlike a suppression hearing, we have no means to order that a small portion of Drummond's trial be redone. Thus, the most appropriate remedy is a new trial.

We need not reach Drummond's cross-appeals.

IV.

For the foregoing reasons, we affirm the district court's conditional grant of the writ of habeas corpus.

————————————

**DISSENT**

————————————

KETHLEDGE, Circuit Judge, dissenting.  The Supreme Court's decisions sometimes contain numerous legal principles, which are sometimes stated at different levels of generality.  The Court's decision in *Waller v. Georgia*, 467 U.S. 39 (1984)—the relevant decision here—is a case in point.  *Waller* concerned a full, rather than partial, closure of the courtroom to the public; but any fair reading of the opinion makes it obvious that even a partial closure requires some balancing of the interests for and against closure.  *See, e.g.*, *id.* at 45 ("[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information").  A state court's failure to apply this general rule in a partial-closure case, therefore, would amount to an unreasonable refusal to extend a legal principle "to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000).

But *Waller* does more than state this general rule of balancing.  Instead, the decision goes on to state a cluster of more specific rules—that "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure[,]" 467 U.S. at 48—that the Court held were applicable to the full-closure at issue there.  What was not obvious at the time of Drummond's trial, however—and thus not clearly established for purposes of the habeas statute—is whether and how these more specific rules apply in cases, like this one, where some spectators but not all are removed from the courtroom.  The Supreme Court's caselaw does not clearly establish, for example, whether in such cases the trial court must identify an "overriding" interest favoring closure, as in *Waller*, or instead only a "substantial" interest, as some circuit courts have inferred, or perhaps even some lesser interest.  Likewise unclear—and thus not clearly established—is whether the closure must be

"narrowly tailored," *id.* at 45, as the Court required in *Waller*, or whether in partial-closure cases a somewhat looser cut will do. And on the procedural side, *Waller* says the court must make "findings adequate to support the closure." *Id.* at 48. But "adequate" is a vague and therefore elastic term; and for all the Ohio courts knew here, "adequate" might mean one thing in full-closure cases, and a different and less rigorous thing when the closure is only partial.

Thus, in my view, we would have grounds for granting the writ if the trial court had omitted altogether to balance the interests for and against the limited closure at issue. That omission would have indeed violated a general principle whose applicability was clearly established at the time of the closure. But here the trial court made no such omission: the court offered serious reasons for the closure and tailored its scope in rough proportion to them. The Ohio Supreme Court then affirmed the trial court's decision in an opinion that—agree with it or not—was reasoned and coherent in its application of *Waller*'s general rule. What Drummond complains about, rather, is the fine print: that the closure was broader than strictly necessary, that the court's findings in support of the closure were not as careful and detailed as they should have been, that the court did not make clear the extent to which it considered other alternatives. Those complaints are by no means frivolous, as the court's decision today makes clear; and it would have been interesting to see what the Supreme Court might done with them if Drummond had sought direct review from that Court rather than just habeas review from the district court. But I think that "[f]airminded jurists," *Metrish v. Lancaster*, 133 S. Ct. 1781, 1792 (2013), could take a different view of Drummond's complaints than the majority does today—precisely because the showings necessary to remove some but not all spectators from the courtroom were not clearly established at the time of his trial. *Accord Garcia v. Bertsch*, 470 F.3d 748, 754 (8th Cir. 2006).

In summary, then, the only principle from *Waller* that was clearly established at the time of the limited closure here was the general one that the trial court must balance the interests favoring closure against those opposing it. The Ohio courts applied that

principle; and they did so reasonably, in the capacious sense of "reasonable" as used for purposes of the habeas statute.

I therefore respectfully dissent from our court's decision to affirm the district court's grant of the writ.