RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JOHN DRUMMOND,

> *Petitioner-Appellee/Cross-Appellant,*

*v.*

MARC HOUK, Warden,

> *Respondent-Appellant/Cross-Appellee.*

Nos. 11-3024/3039

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:07-cv-1776—Sara E. Lioi, District Judge.

Decided and Filed: August 14, 2015

Before: COLE, Chief Judge; GRIFFIN and KETHLEDGE, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:** Charles L. Wille, Jocelyn S. Kelly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant/Cross-Appellee. Alan C. Rossman, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, David L. Doughten, Cleveland, Ohio, for Appellee/Cross-Appellant.

KETHLEDGE, J., delivered the opinion of the court, in which COLE, C.J., joined, and GRIFFIN, J., joined in the result. GRIFFIN, J. (pp. 8–13), delivered a separate opinion concurring in the judgment.

─────────────────

## OPINION

─────────────────

KETHLEDGE, Circuit Judge. John Drummond killed a three month-old girl when he fired an assault rifle at her home. An Ohio jury convicted Drummond of murder and sentenced

1

him to death.  The Ohio Supreme Court affirmed.  Drummond thereafter sought federal habeas relief, which the district court granted on the ground that the trial court had violated Drummond's Sixth Amendment rights when it partially closed the courtroom for the testimony of three witnesses during his trial.  A divided panel of this court affirmed, but the Supreme Court vacated our decision and remanded the case for reconsideration in light of *White v. Woodall*, 134 S. Ct. 1697 (2014).  Having thus reconsidered the case, we reverse the district court's grant of the writ.

I.

Our prior decision recites most of the relevant facts.  *See Drummond v. Houk*, 728 F.3d 520 (6th Cir. 2013).  We now recite only the ones necessary to our decision here.  For several hours during Drummond's trial, the trial court closed the courtroom to the public.  The court explained that one spectator had been disrespectful to deputies and to the court, that another had been charged with assault on a peace officer after an altercation in the courthouse, that some jurors or witnesses felt threatened by some of the spectators, and that Drummond had approached the husband of a potential juror during voir dire.  The court allowed the media to remain in the courtroom.  During this partial closure, three witnesses testified for the prosecution.

The trial court also limited Drummond's ability to cross-examine three other witnesses for the prosecution:  Nathaniel Morris, Dean Thomas, and James Rozenblad.  Drummond sought to ask each of those witnesses about criminal charges that were either pending against them or had previously been dismissed.  The trial court barred those questions, however, because the witnesses had not been convicted of any of the charges.

The jury ultimately convicted Drummond of aggravated murder, among other crimes, and sentenced him to death.  The Ohio Supreme Court affirmed on direct review.  *State v. Drummond*, 854 N.E.2d 1038 (Ohio 2006).  Drummond filed a petition for post-conviction relief in the state trial court, which denied his petition.  The Ohio Court of Appeals affirmed.  *State v. Drummond*, No. 05 MA 197, 2006 WL 3849295 (Ohio Ct. App. Dec. 20, 2006).  The Ohio Supreme Court declined to hear Drummond's appeal.  *State v. Drummond*, 866 N.E.2d 512 (Ohio 2007) (table).

Drummond then filed a habeas petition in federal district court, arguing that the partial closure violated his right to a public trial; that the trial court violated his rights under the Confrontation Clause by limiting his cross examination of Morris, Thomas, and Rozenblad; and that his attorney was constitutionally ineffective during the penalty phase of the trial. The district court denied relief on Drummond's ineffective-assistance and Confrontation Clause claims, but granted a conditional writ of habeas corpus based on his public-trial claim. *Drummond v. Houk*, 761 F. Supp. 2d 638 (N.D. Ohio 2010).

We affirmed, holding that the Ohio Supreme Court had unreasonably applied the holding of *Waller v. Georgia*, 467 U.S. 39 (1984). *See Drummond*, 728 F.3d at 534. One judge dissented. *Id.* at 543-45. Per the Supreme Court's remand order, *see Robinson v. Drummond*, 134 S. Ct. 1934 (2014), we now reconsider the State's appeal.

II.

Under the Antiterrorism and Effective Death Penalty Act, a court may grant habeas relief only if the state court's adjudication of the petitioner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). In *Woodall*, the Supreme Court made clear that "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question[.]" 134 S. Ct. at 1706-07 (internal quotation marks omitted).

A.

Unlike this case, *Waller* concerned a full, rather than partial, closure of the courtroom to the public. (By full closure we mean a closure where the entire public, including the media, is excluded from the courtroom.) But the Supreme Court began its analysis by stating a general rule that applies to any type of courtroom closure, to wit: a trial court must balance the interests for and against closure. *See* 467 U.S. at 45. The Ohio courts reasonably (in the habeas sense) applied that general rule here: the trial court offered serious reasons for the closure and tailored its scope in rough proportion to them; and the Ohio Supreme Court affirmed the trial court's

decision in an opinion that—agree with it or not—was reasoned and coherent in its application of that general rule.

But *Waller* also laid down a cluster of more-specific rules—"the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure"—that the Court held were applicable to the full-closure at issue there. 467 U.S. at 48. Drummond argues that the trial court violated those rules: in his view, the closure in his case was broader than strictly necessary, the court's findings in support of the closure were not as careful and detailed as they should have been, and the court did not make clear the extent to which it considered other alternatives.

Drummond's arguments are by no means frivolous, as our decision today in a direct-review case makes clear. *See United States v. Simmons*, ___ F.3d ___ (2015). But Drummond's case comes to us on habeas review rather than direct. Per the Supreme Court's precedents, therefore, the relevant question is not whether we agree with Drummond's arguments, but whether any "fairminded jurist" could disagree with them. *Woodall*, 134 S. Ct. at 1707. In answering that question, we can consider only the Supreme Court caselaw that was already on the books at the time of the Ohio Supreme Court's decision here. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). (We also note that, contrary to Drummond's assertion otherwise, it is by no means clear that the Court's later decision in *Presley v. Georgia*, 558 U.S. 209 (2010), involved only a partial closure. For in *Presley* the trial court excluded "the public" rather than only a part of it. *Id.* at 210.)

Drummond's arguments are premised on the assertion that we should extend *Waller*'s more specific rules—in their entirety, with no alteration—from the full closure at issue there to the partial closure at issue here. What was not obvious at the time of the Ohio Supreme Court's decision, however—and thus not clearly established for purposes of the habeas statute—is whether and how these more specific rules apply in cases, like this one, where some spectators but not all are removed from the courtroom. The Supreme Court's caselaw does not clearly establish, for example, whether in such cases the trial court must identify an "overriding" interest

favoring closure, as in *Waller,* or instead only a "substantial" interest, as some circuit courts have inferred, or perhaps even some lesser interest. Likewise unclear—and thus not clearly established—is whether the closure must be "narrowly tailored," 467 U.S. at 45, as the Court required in *Waller,* or whether in partial-closure cases a somewhat looser cut will do. And on the procedural side, *Waller* says the court must make "findings adequate to support the closure." *Id.* at 48. But "adequate" is a vague and therefore elastic term; and for all the Ohio courts knew here, "adequate" might mean one thing in full-closure cases, and a different and less rigorous thing when the closure is only partial.

*Woodall* itself provides some parallels. That case concerned the so-called "no-adverse-inference rule," which the Supreme Court announced in *Carter v. Kentucky*, 450 U.S. 288 (1981). Per that rule, juries are instructed not to infer, from a defendant's decision not to testify, that the defendant is guilty. The question in *Woodall* was whether—"beyond any possibility for fairminded disagreement[,]" 134 S. Ct. at 1703—the no-adverse-rule applies the same way in the penalty phase as it does in the guilt phase. Our court had answered yes, beyond any fairminded disagreement, the rule applies the same way in both phases. 685 F.3d at 579. But the Supreme Court held the answer was not so clear. In terms applicable here, the Court said that "[t]he critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question[.]" 134 S. Ct. at 1706-07. Then the Court said that "[p]erhaps" the no-adverse-inference rule should apply in the penalty phase exactly as it does in the guilt phase, but "perhaps not." *Id*. at 1707. What matters, the Court said, was that "we have not yet taken that step, and there are reasonable arguments on both sides—which is all Kentucky needs to prevail in this AEDPA case." *Id.*

The same reasoning applies here. Just as in *Woodall*, the factual context in the relevant Supreme Court case and the petitioner's case are meaningfully different: *Carter* involved the guilt phase, *Woodall* the sentencing; *Waller* involved a full closure, *Drummond* a partial one. And for the reasons discussed above, "there are reasonable arguments," *id.*, that *Waller* does not apply to partial-closure cases in the wholesale manner that Drummond says it does. The only principle from *Waller* that was clearly established for purposes of the partial closure here was the

general one that the trial court must balance the interests favoring closure against those opposing it. The Ohio courts applied that principle; and they did so reasonably, in the capacious sense of "reasonable" as used for purposes of the habeas statute. The Ohio Supreme Court's application of *Waller* to Drummond's case therefore was not unreasonable within the meaning of the habeas statute, which means that he is not entitled to relief on this claim.

### B.

Drummond also argues that the trial court violated his rights under the Confrontation Clause when it barred him from cross-examining Morris, Rozenblad, and Thomas about pending or previously dismissed criminal charges. But so far the Supreme Court has recognized a defendant's right to cross-examine a witness about criminal charges only in one circumstance: when the government has agreed to give the witness favorable treatment in exchange for his testimony. *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). Here, all three witnesses testified that the State had not agreed to any such arrangement in their cases. Thus, the trial court's decision to bar Drummond from cross-examining Morris, Rozenblad, and Thomas about their criminal history was not contrary to the Supreme Court's holding in *Van Arsdall*. The district court properly denied habeas relief based on Drummond's Confrontation-Clause claim.

### C.

Finally, Drummond argues that he is entitled to relief because his attorney was constitutionally ineffective. Specifically, Drummond says that his lawyer should have interviewed Drummond's half-brother, Michael Brooks, and called Brooks to testify during the penalty phase of the trial. To show a constitutional violation based on ineffective assistance of counsel, a petitioner must show both that his lawyer's performance fell "below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

A defense lawyer need not interview every member of a defendant's family when gathering mitigation evidence. *Bobby v. Van Hook*, 558 U.S. 4, 9-12 (2009). Instead, there

"comes a point at which evidence . . . can reasonably be expected to be only cumulative, and the search for it distractive from [the attorney's] more important duties." *Id.* at 11.

Here, Drummond's lawyer retained an investigator and a psychologist to seek out mitigation evidence. And Drummond's lawyer himself obtained evidence that Drummond was unsupervised as a teenager, that his parents divorced when he was 14, that he stayed with his father until they had a falling out, that he later moved in with his half-brother, that he had failing grades, that he dropped out of school, and that he joined a gang. Thus, the decision of Drummond's defense counsel "not to seek more mitigating evidence from the defendant's background than was already in hand"—by interviewing Drummond's half-brother as well— "fell well within the range of professionally reasonable judgments." *Id.* at 11-12 (internal quotation marks omitted).

Moreover, Brooks's affidavit merely recites facts about Drummond's background that the jury already knew. Drummond therefore cannot show a reasonable probability that, if Brooks had testified, the jury would not have sentenced him to death. The district court properly denied relief on this claim.

\* \* \*

The district court's conditional grant of the writ of habeas corpus is reversed. The district court's judgment is otherwise affirmed.

---

**CONCURRING IN THE JUDGMENT**

---

GRIFFIN, Circuit Judge, concurring in the judgment. In the seminal case *In re Oliver*, the Supreme Court granted a petition for a writ of habeas corpus and held that the Sixth Amendment's guarantee of the right to a public trial applied to the states through the Due Process Clause of the Fourteenth Amendment. 333 U.S. 257, 273, 278 (1948). In doing so, the Court traced the history of the Sixth Amendment's public trial guarantee:

> This nation's accepted practice of guaranteeing a public trial to an accused has its roots in our English common law heritage. The exact date of its origin is obscure, but it likely evolved long before the settlement of our land as an accompaniment of the ancient institution of jury trial. In this country the guarantee to an accused of the right to a public trial first appeared in a state constitution in 1776. Following the ratification in 1791 of the Federal Constitution's Sixth Amendment, which commands that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *" most of the original states and those subsequently admitted to the Union adopted similar constitutional provisions. Today almost without exception every state by constitution, statute, or judicial decision, requires that all criminal trials be open to the public.

*Id*. at 266–68 (footnotes omitted).

Writing for the Court, Justice Black elaborated on the reasons for, and importance of, the right to a public trial:

> The traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet. All of these institutions obviously symbolized a menace to liberty. In the hands of despotic groups each of them had become an instrument for the suppression of political and religious heresies in ruthless disregard of the right of an accused to a fair trial. Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society, the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.

*Id*. at 268–70 (footnotes omitted).

In the present case, Ohio death-row inmate John Drummond petitions for the Great Writ of Habeas Corpus[1] on the grounds his fundamental and paramount right to a public trial was violated. For the reasons stated in our previous opinion, *Drummond v. Houk*, 728 F.3d 520 (6th Cir. 2013), *vacated and remanded sub nom. Robinson v. Drummond*, ___ U.S. ___, 134 S. Ct. 1934, No. 13-496 (Apr. 28, 2014), he is correct in his claim of error. During Drummond's trial, the state judge summarily ordered a portion of Drummond's trial closed to the public. In doing so, the trial judge failed to consider any alternatives to the public closure and neglected to acknowledge or apply the factors required by the holding of *Waller v. Georgia*, 467 U.S. 39 (1984).

In a 4-3 decision, the Supreme Court of Ohio rejected Drummond's Sixth Amendment claim and affirmed his convictions and death sentence. The three dissenting Justices would have reversed on the grounds that Drummond's structural right to a public trial was violated. In dissent, Chief Justice Moyer, joined by Justices Pfeifer and O'Donnell, wrote in pertinent part:

> As to the first *Waller* factor, there is little evidence that courtroom security and witness safety justified closing the courtroom on February 4.
>
> * * *
>
> As to the second *Waller* factor, the majority emphasizes that closure was no broader than necessary because the courtroom was closed only during the testimony of Thomas and Morris, and Rozenblad's cross-examination. However, Thomas, Morris, and Rozenblad were key prosecution witnesses, and their testimony was crucial in securing Drummond's conviction.
>
> * * *
>
> Drummond's family members were not allowed to remain in the courtroom during closure. Defense counsel requested that Drummond's family members be allowed to remain in court to provide support for the defendant. Despite this request, the trial court expelled from the courtroom all spectators except for news reporters. The Supreme Court of the United States has specifically emphasized the importance of allowing members of a defendant's family to remain in court. *See In re Oliver* (1948), 333 U.S. 257, 272, 68 S. Ct. 499, 92 L. Ed. 682; see, also, *State v. Washington* (2001), 142 Ohio App. 3d 268, 272, 755 N.E.2d 422 ("The state bears a heavy burden when seeking to exclude relatives of a defendant from trial"). The record provides no justification for excluding family members from

---

[1] The framers of our Constitution acknowledged the fundamental importance of the Great Writ when they provided in Article 1, Section 9: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

the courtroom. No evidence was presented showing that any family members posed a risk of disturbing the court or threatening any of the witnesses or jurors.

\* \* \*

Third, nothing in the record shows that the trial court considered other reasonable alternatives to closing the courtroom, as *Waller* requires.

\* \* \*

Fourth, regarding the final *Waller* factor, the trial court failed to make findings adequate to support the courtroom closure.

\* \* \*

Here, the record contains little information to aid a reviewing court in determining whether the trial court's order was reasonable and necessary. . . . These matters may have been considered by the court during a sidebar discussion, but no such discussions were included in the record, as *Waller* requires.

\* \* \*

Key prosecution testimony was presented while the courtroom was closed. Thus, the trial court erred by failing to make specific findings before closing the courtroom.

I would reverse Drummond's convictions and death sentence because Drummond was denied his Sixth Amendment right to a public trial.

*State v. Drummond*, 854 N.E.2d 1038, 1078–80 (Ohio 2006). Although the four-Justice majority of the Supreme Court of Ohio disagreed with Chief Justice Moyer, the position taken by the majority was inconsistent with *Waller* for the reasons stated in our prior opinion.

In this regard, Drummond's case is similar to, but more egregious than, *Presley v. Georgia*, 558 U.S. 209 (2010) (per curiam). In *Presley*, the Supreme Court granted a writ of habeas corpus on the basis that petitioner Presley's Sixth Amendment right to a public trial was unreasonably violated because a Georgia state trial judge ordered the voir dire jury selection portion of Presley's trial closed to the public. *Id.* at 216. In *Presley*, the "lone courtroom observer"—Presley's uncle—was ordered out of the courtroom. *Id.* at 209.

Significantly, the *Presley* Court reiterated that the First Amendment right of the press to observe criminal trials was previously decided in *Press-Enterprise Co. v. Superior Court of California, Riverside County*, 464 U.S. 501 (1984), and not an issue in *Presley*. 558 U.S. at 212. Furthermore, the Court noted that although the First Amendment right of the press to cover criminal trials overlaps with the Sixth Amendment right of the public to attend, "[t]he extent to

which the First and Sixth Amendment public trial rights are coextensive is an open question, and it is not necessary here to speculate whether or in what circumstances the reach or protections of one might be greater than the other." *Id.* at 213. Thus, the Supreme Court viewed press and public spectators differently.

In the present case, had the trial judge excluded both press and public spectators, we would likely be addressing not only a Sixth Amendment claim under *Waller*, but also a First Amendment challenge applying *Press-Enterprise*.

The Warden attempts to justify the public trial deprivation and *Waller* violation on the grounds that the trial closure at issue was a "partial" public closure, only, rather than a complete public closure. The Warden relies on *Woods v. Kuhlmann*, 977 F.2d 74 (2d Cir. 1992), *Nieto v. Sullivan*, 879 F.2d 743 (10th Cir. 1989), and *Douglas v. Wainwright*, 739 F.2d 531 (11th Cir. 1984), for the proposition that partial closures are governed by a modified *Waller* standard.

First, the Supreme Court has never recognized the partial-versus-total closure distinction. In my view, the holding of *Waller* applies to both. *See generally Johnson v. Sherry*, 586 F.3d 439, 443–44 (6th Cir. 2009). Second, should such a dichotomy exist, the present case involves a total closure to the public, not a partial closure. Only members of the press were allowed to enter Drummond's closed courtroom. Moreover, in none of the "partial" closure cases relied upon were all members of the public excluded from the trial. Rather, in all cases, some members of the public, along with the press, were permitted to view the trial. *See Woods*, 977 F.2d at 76 (excluding only defendant's relatives for testimony of one witness); *Nieto*, 879 F.2d at 753 (same); *Douglas*, 739 F.2d at 532 (family members of defendant, a witness, and decedent remained during closure).

Finally, even if a modified *Waller* test applied, the state trial judge failed to apply it and, for the reasons stated in our previous opinion, the attempt by the four-Justice majority of the Supreme Court of Ohio to reconcile a modified *Waller* analysis with what occurred in the trial was erroneous.

Nonetheless, by application of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, Drummond is entitled to habeas relief for his constitutional

violation only if the decision of the Supreme Court of Ohio was "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003).

This case is close to an "extreme malfunction[]" in the state criminal justice system, *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011), for which habeas relief is mandated. Indeed, the merits of Drummond's claim of Sixth Amendment error were recognized by three Justices of the Supreme Court of Ohio, United States District Judge Sara E. Lioi in granting the petition for habeas, and the majority of our court in affirming the district court.

However, following our decision, on petition by the Warden for a writ of certiorari, the Supreme Court vacated our judgment and remanded "for further consideration in light of *White v. Woodall*,"___ U.S. ___, 134 S. Ct. 1697 (2014). In that case, our court held that it was clearly established federal law as determined by the holdings of the Supreme Court that the Fifth Amendment privilege against self-incrimination applied to the penalty phase of a death penalty case and thus the petitioner was entitled to a no-adverse-inference instruction at the penalty phase of his trial. *Woodall v. Simpson*, 685 F.3d 574, 581 (6th Cir. 2012). In so holding and granting the habeas petition, we drew the logical inference which follows from the holdings of *Carter v. Kentucky*, 450 U.S. 288 (1981) and *Estelle v. Smith*, 451 U.S. 454 (1981). In his dissent in *White*, Justice Breyer (joined by Justices Ginsberg and Sotomayor) agreed and asserted that AEDPA does not prohibit the logical inference that follows from combining the holdings of the Supreme Court decisions. 134 S. Ct. at 1707−10 (Breyer, J., dissenting). As noted by Justice Breyer, the holding of *White* appears to be that the previously accepted holdings of *Carter* and *Estelle* contain exceptions which he and our court failed to recognize.

In the present case, however, the refinement of the holdings of *Carter v. Kentucky* and *Estelle v. Smith* is not at issue. Accordingly, we must assume that the remand in the present case was directed at the AEDPA standard of review language contained within the majority opinion. That language, and the Court's later admonition in *Woods v. Donald*, ___ U.S. ___, 135 S. Ct. 1372 (2015), is recited in our recent en banc decision, *Hill v. Curtin*, ___ F.3d ___, No. 12-2528, 2015 WL 4114658 (6th Cir. July 9, 2015).

In light of AEDPA's considerable restrictions of federal court review of state court judgments, and the decision by the Supreme Court to vacate our previous judgment, we are

compelled to reverse the district court and deny Drummond's petition for a writ of habeas corpus. The judgment of the Supreme Court of Ohio was erroneous, but not objectively unreasonable, i.e. not "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Drummond's habeas relief, if any, lies not with our court, but with the Supreme Court.